Anthony DeGIDIO, James Murray, Antti John Haavisto, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Orville PUNG, individually, Robert Erickson, individually, and Mary Madonna Ashton, individually, Defendants.

No. Civ. 4–84–352.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 19, 1989.

FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiffs Anthony DeGidio, James Murray, and Antti John Haavisto brought this class action on behalf of themselves and other similarly situated plaintiffs. On June 13, 1985 the court certified a class for purposes of injunctive relief. The class is comprised of "persons who are, or have been, incarcerated at the Minnesota State Prison at Stillwater, Minnesota who contract, or had, tuberculosis or develop positive reactions demonstrating exposure to tuberculosis while being held there." *DeGidio v. Perpich*, 612 F.Supp. 1383, 1391 (D.Minn.1985). They seek injunctive relief to revise the current system of health care delivery and prevent the future spread of tuberculosis infection and disease at the Minnesota State Prison at Stillwater.[1] Defendants are Orville B. Pung, Minnesota Commissioner of Corrections; Sister Mary Madonna Ashton, Minnesota Commissioner of Public Health; and Robert Erickson, warden of the Minnesota State Prison at Stillwater.[2]

This action is brought under 42 U.S.C. § 1983; jurisdiction is alleged pursuant to 28 U.S.C. § 1343. Plaintiffs allege that defendants' conduct in response to the outbreak of tuberculosis at Stillwater Prison constitutes cruel and unusual punishment of the class members. Plaintiffs also claim that defendants have violated their due process rights by failing to comply with a prior consent decree entered in the case of *Hines v. Anderson*, 439 F.Supp. 12 (D.Minn.1977).

Trial to the court was conducted over thirty-one days. Voluminous exhibits and extensive testimony were received. Post

Terence J. McCloskey, Jensen, Weyland & McCloskey, P.A., Brooklyn Park, Minn. and Arlo H. Vande Vegte, Long Lake, Minn. for plaintiffs.

Richard S. Slowes, Asst. Sol. Gen. and Jean Boler, Sp. Asst. Atty. Gen., Office of the Minnesota Atty. Gen., St. Paul, Minn., for defendants.

1. Individual damage actions are pending in state court; this court previously dismissed damage claims because of the Eleventh Amendment. *See* Memorandum Opinion and Order, June 12, 1985.

2. Other named defendants were previously dismissed from this action. The State of Minnesota was dismissed on October 11, 1984. Defendant Rudy Perpich and the claims against defendants Pung (Corrections Commissioner), Erick-

son (warden of Stillwater Prison) and Ashton (Commissioner of Health) in their official capacities were dismissed June 13, 1985. Plaintiffs' complaint for injunctive relief against Dr. James Allen was dismissed as moot; the damage claims against him were dismissed without prejudice. *See* Memorandum Opinion and Order, February 20, 1986. At the beginning of trial plaintiffs stated that allegations against the Doe defendants should also be dismissed.

trial briefs were also submitted. Now having evaluated and considered the testimony of the witnesses and all the evidence produced at trial, as well as the parties' arguments and the post-trial submissions, the court enters in memorandum form its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

*The Parties*

The named plaintiffs, Anthony DeGidio, Jr., Antti Haavisto and James Murray are all present or former inmates of the Minnesota Correctional Facility–Stillwater (Stillwater). They represent a class of Stillwater inmates or former inmates who contracted tuberculosis or developed positive reactions demonstrating exposure to tuberculosis after being confined there. Since 1982 there have been nearly a dozen inmates diagnosed with active tuberculosis disease, and over one-third of the inmate population has been infected. During this time, there have been periods when the disease has apparently waned, only to break out again with ever-broader exposure throughout the prison. Plaintiffs seek injunctive relief to improve their medical care and to institute an effective program of tuberculosis detection, control, and prevention at Stillwater.

The Department of Corrections is an administrative agency within the executive branch of the State of Minnesota. Defendant Pung has been Commissioner of the department since 1982. Among his duties is operation of nine state correctional facilities, including Stillwater. As Commissioner, Pung is ultimately responsible for the medical policies, procedures, staffing and procurement of equipment necessary to deliver health care to inmates. He is further responsible for implementing court orders affecting the administration and operation of the prison and for otherwise discharging statutory and regulatory duties regarding the prison.

Defendant Erickson has been warden of Stillwater since 1980. He was associate warden from 1976 through 1980. He is responsible for the day-to-day operations at Stillwater and ultimately controls most of its administration and operation.

Defendant Ashton directs the Minnesota Department of Health, a state administrative agency. The department operates a tuberculosis control unit within its disease prevention and health promotion division. That unit has directed much of the prevention, control, and educational efforts at Stillwater since the tuberculosis outbreak in 1982. It continues to counsel Stillwater staff regarding prevention and control of infectious diseases.

*Tuberculosis Infection and Disease*

Tuberculosis is an infectious disease caused by the transfer of tubercle bacilli. It is transmitted through airborne droplets expelled from the lungs of an infected person through talking, coughing, sneezing, or the like. Tuberculosis infection usually results after a prolonged period of sharing air with someone contaminated with an active case of infectious pulmonary tuberculosis. It usually manifests itself in the lungs, but may occur in other organs such as lymph nodes or bones. Infectious tuberculosis disease is not common in the United States. It is most prevalent among members of lesser-advantaged socio-economic classes. Prisons are considered high risk environments for the transmission of tuberculosis.

There is a distinction between tuberculous infection and disease. Tuberculous infection means that tubercle bacilli have become established in the body, but are dormant. A person who is merely infected is not infectious to others. Infectiousness develops when the infection breaks down into active disease and becomes established in the lungs. This breakdown into active disease can usually be prevented by a course of preventive antibiotic therapy.

Left untreated, only a small percentage of infected persons will ever go on to develop the active disease. The risk grows for untreated infected persons, however, when certain other conditions develop. These conditions include diabetes, HIV infection (AIDS), or other illnesses which cause immunosuppression. Although the risk is greatest in the first year after infection, it is life-long without antibiotic preventive therapy.

The preferred screening tool for tuberculosis is the Mantoux skin test. The Mantoux test involves injecting a precise amount of purified protein derivative of tuberculin (PPD) under the skin on the patient's forearm. The test site is examined 48–72 hours later. A hard swelling reaction, or induration, of 10 millimeters or more is considered significant and means that the individual is infected with tuberculosis. A reaction of less than 10 millimeters in an adult is considered not positive. Mere redness, or erythema, without induration is not generally considered evidence of infection regardless of its size.

Once a person has been infected, there can be an eight to ten week period of latency before a positive skin test will result. A single test is therefore not sufficient to rule out infection. A follow-up skin test conducted ten weeks after the initial test is necessary and required by accepted medical standards to rule out infection from a recent contact.

Although the Mantoux test is the best tool available for screening for tuberculosis, both false positives and false negatives are possible. False positives can occur if too much tuberculin is injected or if the tuberculin is too strong, as has sometimes been the case with the Parke–Davis brand PPD. False negatives are possible if the tuberculin is injected too deeply or not deeply enough. A false negative can also occur if the individual was only recently infected (within eight to ten weeks) or if the individual was infected long ago and the infection has waned. If the negative reaction to the Mantoux is the result of waning, the test can reawaken the individual's sensitivity; on a subsequent Mantoux test the result may be a positive reaction. Such an occurrence—a non-significant reaction followed by a positive reaction—can make it appear that the individual is a recent converter when in fact the infection is from the past. This "booster" phenomenon can occur even after a second non-significant reaction. The test results are thus not always correct in indicating the presence or absence of infection.

The onset of active tuberculosis disease is generally gradual and often includes such symptoms as loss of weight, loss of appetite, fatigue, night sweats, chills, coughing, elevated temperature, and production of sputum which may be bloody. The symptoms may also be nonspecific, however, or a person may even be asymptomatic. Symptoms often mimic other diseases such as influenza, bronchitis, pneumonia, or lung cancer.

The degree of a person's infectiousness usually correlates to the length of time that active disease is present in the lungs. Typically the tubercle bacilli invade lung tissue and dissolve it over time, creating cavities. Each cavity can contains billions of bacilli, some of which are transmitted into the air each time the person expels air.

The quantity of phlegm or sputum produced by the infected person is one rough measure of infectiousness—the more sputum coughed up the more infectious the person is. The better measure of infectiousness is done clinically, by examining a stained sputum smear and counting the number of acid-fast bacilli present.

Active tuberculosis disease is formally diagnosed by culturing sputum samples on a medium for several days. If tuberculosis bacilli are found, the person is considered to be a bacteriologically confirmed active case. A positive culture does not provide a precise measure of infectiousness, however.

Once tuberculosis infection is suspected through a positive Mantoux test, the standard medical practice is to order a chest x-ray to determine if active disease has developed. Tuberculosis disease can be revealed on x-rays through nodules, cavities, or infiltrates. The disease can mimic many other pulmonary diseases, however. While an x-ray may trigger suspicion that active disease is present, a definitive diagnosis is made only bacteriologically, through a sputum smear or culture. Sputum smears are not typically ordered unless abnormal or questionable x-rays are produced.

If there is no sign of active disease on the x-ray, the person generally is started on a course of antibiotic treatment with

926

isoniazide (INH) unless counterindicated. Persons with positive Mantoux tests and normal x-rays who are eligible for INH are generally started on the drug without sputum tests. The standard preventive therapy is a regime of nine to twelve months of INH. An infected person who completes a course of INH preventive therapy is unlikely ever to develop the active disease.[3] Some patients are not candidates for INH preventive treatment, however. INH can cause liver toxicity or a chemically induced hepatitis; it is not generally prescribed to persons with abnormal liver function test results. It is usually not prescribed to persons over 35. Those who test positive but do not take INH are cautioned to receive periodic chest x-rays for the rest of their life.

Persons found to be infected with active tuberculosis disease are placed on a drug regimen which includes INH and other antibiotics, for up to one year. Cure rates are high. Isolation is necessary until the patient is no longer infectious, which in most cases is after one or two weeks of chemotherapy. After the infectious period has passed, the patient is treated on an outpatient basis.

The likelihood of tuberculosis being spread depends upon the volume of shared air with the infectious source, the source's degree of infectiousness, and the duration of contact with the source. Several factors increase the risk of transmission of the disease. They include a small volume of air, a high degree of infectiousness, and a long duration of contact. Tuberculosis bacilli in droplet form remain suspended in the air for several hours. Contaminated air which is recirculated mechanically can spread the disease beyond those in immediate proximity. In a closed space with a mechanical air recirculation system, droplets containing tuberculosis bacilli will eventually be distributed widely.

The amount of sunlight or fresh air entering a confined space can affect the likelihood of transmission. Tuberculosis bacilli are greatly diluted and disbursed in the outdoors, and there is almost no possibility of contracting tuberculosis from fresh air. Tubercle bacilli are also destroyed by sunlight or other ultraviolet rays.

*Tuberculosis Control and Investigation*

After a tuberculosis outbreak is discovered, the focus of public health authorities turns to those in close proximity to an infected person. The Center for Disease Control (CDC)[4] and the American Thoracic Society (ATS)[5] recommend a "concentric circle" approach for determining whether people who have had contact with a person with active tuberculosis have become infected. Under this method, the circle of individuals identified as the source case's closest contacts are tested first for infection.

The judgment of someone trained in the epidemiological aspects of tuberculosis detection and control is needed to conduct a contact investigation. The most critical decision is where to begin testing. The targets of the first circle should be persons who have faced the greatest likelihood of infection. Some factors to consider include the duration and degree of infectiousness, the volume of shared air with close contacts, and the type of contacts—for exam-

3. Plaintiffs presented expert testimony regarding the relationship between tuberculosis infection and the HIV (AIDS) virus. Infectious disease experts are uncertain whether the prophylaxis which INH generally provides will continue if the person contracts AIDS. There is widespread concern that as AIDS becomes more prevalent, persons infected with both AIDS and tuberculosis will be more likely to develop tuberculosis disease because normal body defense mechanisms will no longer prevent breakdown into active disease.

4. CDC is a national center for study and control of disease based in Atlanta, Georgia. CDC is particularly respected for its expertise in studying and controlling infectious diseases such as tuberculosis.

5. ATS is an association of physicians and other medical experts who specialize in treatment of diseases of the heart and lungs. It is a branch of the American Lung Association. ATS publications are authored by committees of experts and are widely accepted as authoritative. ATS has published guidelines jointly with CDC for the surveillance, control, and treatment of tuberculosis (ATS/CDC guidelines).

ple, physical intimacy or mere close proximity. The choice of a first circle is ultimately a matter of judgment in light of the circumstances. Normally, however, the first circle includes those who share the household with the infectious person. In a prison the closest contacts would generally be inmates in shared or neighboring cells.

If Mantoux tests of these high risk contacts show a new Mantoux converter (someone who previously tested negative but now tests positive), the testing must be expanded to the next circle of contacts. The testing continues to expand to circles of more remote contacts until no new Mantoux converters are found. At that point no further testing is necessary. Because it may take eight to ten weeks before an infected person will have a positive Mantoux reaction, a test with a negative result should be repeated after the latency period has passed. The concentric circle approach has been adopted by the Minnesota Department of Health and is the model purportedly used at Stillwater since 1982.

*The Stillwater Facility*

Construction of Stillwater was completed in approximately 1923. Its population has grown from an average of 900 in the mid–1970's to approximately 1200 today. It is considered a medium to maximum security facility. The inmate population comprises a wide spectrum of ages, ethnic and racial groups, and health problems.

The prison grounds consist of several buildings and open areas, all enclosed by a security wall. The inmate living quarters are called cell halls. There are four cell halls, designated by letters as A–D. Cell halls A and B are the largest; each houses from 400 to 500 inmates. Each is laid out in a similar way: the cells are in the center portion, and are surrounded by interior open space which borders the exterior wall of the building. Stillwater also has a minimum security unit known as the farm. It is located outside the compound walls; inmates live there in dormitory-style living arrangements.

Inmates are housed one to each cell. The cells are located side-by-side, and there are four vertical tiers of cells. Each cell has a solid rear wall from which extrudes a $6'' \times 8''$ ventilation duct; each cell has solid side walls. The front of each cell is barred and open. Immediately in front of each upper tier cell is a walkway with a railing. The walkway hugs the front of the cells for the length of the cell hall and leads to a common stairway. Beyond the walkway is an open space (common area) which extends the length of the cell hall from floor to roof. The exterior wall of the cell hall contains banks of windows rising to the roof. These windows can be opened by the guards. Some are frequently opened when the weather is mild. There is no policy or schedule for opening windows, and it is unknown how much fresh air enters the cell hall that way.

Each cell hall has an independent ventilation system. When the weather does not demand the use of the heating system, fresh air enters through cupola vents on the roof. The air is drawn down to the basement into a plenum, or air tunnel. From there it is blown through air ducts and out a ventilation hole in each individual cell, through the cell, and out into the common area of the cell block. The air is then vented to the outside. When heating is required, the air flow is reversed. Hot air is blown out of vents on the wall opposite the cells into the common area. It is drawn into the cells through the individual ventilation holes, then into the ductwork and down to the plenum. From there it is recirculated through heating units, and fans blow the reheated air back out the vents. In this mode, little or no fresh air is introduced through the ventilation system.

The ventilation system is basically unchanged since the prison was constructed. William Mordich, director of the prison physical plant, testified that he has made several budget requests for automating the temperature control and fresh air intake. This goal was to save energy rather than to provide fresh air exchange for tuberculosis control. The proposed modifications would, however, increase fresh air exchange by approximately 15%. The legislature has not funded these proposals.

Ultraviolet radiation destroys tuberculosis bacilli. One means of controlling the spread of tuberculosis at Stillwater would be to install ultraviolet light fixtures in the ventilation plenums. No such fixtures have been installed or even proposed, however.

The cell halls have varying uses, and each cell hall unit is sealed off from the others. The main cell halls, A–Hall and B–Hall, are each divided in half. A–Hall is divided into A–West and A–East; B–Hall is divided into B–West and B–East. A–East during the period 1982 through 1984 was known as "AEU." A–West is also divided into two halves. One-quarter of cell hall B is the segregation unit at the prison. The receiving and orientation unit is located in Cell Hall D. This is where new inmates are housed until they have completed their medical screening and their initial receiving and orientation process. After approximately two weeks of orientation, a new inmate is moved to the south half of D–Hall until he is given a more permanent living assignment based upon his vocational or educational plans. Inmates who do not hold jobs and who are classified as "permanent idles" are housed in A–East (formerly AEU). Inmates who attend school are also housed in A–East. Inmates who obtain jobs within the institution have generally been housed in B–Hall. It is Stillwater policy that an inmate may not live in B–Hall unless he has a job.

The prison houses other inmates in addition to those convicted in Minnesota courts. Federal detainees of the Immigration and Naturalization Service or the criminal justice system are housed separately. There are also currently many inmates from other states who come to Stillwater under arrangements Minnesota makes with other states.

Inmates' living assignments are frequently changed. This can result from security concerns, changes of job status, crowding, or other reasons. On average, ten to twenty inmates may be transferred any given day. The frequency of transfers increases the difficulty of conducting contact investigations of a tuberculosis patient's close contacts. It also increases the risk of spreading communicable diseases more widely through the prison.

The health services unit is located in a separate building within the compound walls. Until the mid–1970's the building was operated as a hospital. It has now been remodeled and is used almost exclusively as an outpatient infirmary. There are, however, a few beds used for temporary inpatient care. These are typically used for inmates with temporary, non-critical, medical problems such as a broken leg or a back condition. Inmates who need hospitalization are sent to a secured unit at the Saint Paul Ramsey Medical Center (SPRMC); this unit was created in 1974, specifically for treating inmates.

Nearly every function of the health services staff is performed at the health services building. New inmates undergo intake screening and physicals there. Inmates may sign up for sick call each morning and are given a pass to go there to see health services staff.

*The Hines Consent Decree*

In 1973 a class action lawsuit was filed on behalf of a class of Stillwater inmates, challenging various aspects of health care delivery. On May 27, 1977, a consent decree was entered between the class and defendants, including the Governor of Minnesota, the Corrections Commission, the Stillwater warden, and the executive officer of the state Board of Health. *Hines v. Anderson*, 439 F.Supp. 12 (D.Minn.1977). The consent decree involved several aspects of medical care at the prison and SPRMC.

Plaintiffs allege that numerous violation of the *Hines* decree have occurred.

—Defendants have failed to render "necessary and adequate medical care" to all inmates regardless of their status as inmates.

—Defendants have failed to post and distribute the "Patient's Bill of Rights" set forth in Minn.Stat. § 144.651.

—Defendants have failed to provide a full-time physician and an adequate number of nurses and other medical staff.

—Defendants have failed to provide an administrative chief of medical services whose primary responsibility is administration of the health care needs of inmates.

—Defendants have allowed non-medical administrative and security concerns unnecessarily to override inmates' valid medical needs.

—Defendants have failed to consult with medical experts or follow their advice.

—Defendants have failed to arrange for adequate annual independent inspections to assure that the health care system meets the inmate's needs and complies with medically sound standards.

—Defendants have failed timely to remedy deficiencies noted in annual inspection reports.

Counsel for the *Hines* plaintiffs was James Cullen, who at that time was the director of Legal Aid for Minnesota Prisoners (LAMP). He filed the class action on behalf of the inmates and negotiated the consent decree. His testimony before this court shed light on the intentions of those who drafted the decree.

One of the *Hines* plaintiffs' major concerns was deficiencies with the prison infirmary which had been operated as a hospital. By the time of the consent decree, however, most in-patient medical care for inmates had been transferred to the SPRMC security unit. The decree memorialized defendants' promise to continue using the security unit or another hospital for all in-patient care. Many of the other changes required by the decree were administrative matters taken up by the health services administrator, Clyde Eells.

Evidence at trial showed that line staff or other employees not involved in the upper ranks of administration are generally unaware of the *Hines* decree. There is no established practice of training most employees regarding the decree's requirements. Nonetheless, the warden testified that he and the health services administrator regard the provisions of the decree as mandatory. Milt Olson, former administrator of special services, had only vague recollections of the decree. Yet his predecessor, Clyde Eells stated that he was the person primarily responsible for implementing *Hines* at the prison.

### Health Services Administration

Warden Erickson is responsible for the overall operation and maintenance of Stillwater. The administrative structure under the warden has evolved over the last decade.

Until 1982 administrative responsibility for the daily operations of the health service was vested in the "health services administrator." This was Lieutenant Clyde Eells from 1976 through 1982. His sole responsibility was dealing with the administrative and clerical needs of the health services unit. Eells had no formal training in medical care or administration of medical facilities. He viewed his role as being a facilitator and advocate for the medical staff within the prison bureaucracy. He was involved with budgets, staffing, scheduling, and inmate movement. The administrator for health services took no part in medical decisions regarding treatment of inmates.

Eells' position was abolished in 1982, and in its place was substituted the position "director of special services." This was staffed by an employee of captain rank with presumably more administrative experience and more direct access to the warden. Milt Olson filled this position until his retirement in June 1986. Since then it has been held by Donald Engeldinger who was appointed by warden Erickson.

The director of special services is responsible not only for the health services unit, but also for chemical dependency treatment, the protective custody unit, receiving and orientation, the chaplain service, the psychiatry and psychology unit, and the pharmacy. The director of special services does not exercise medical judgment; the position is purely an administrative one. About half of the director's time is dedicated to health services issues. Neither Olson nor Engeldinger have had any formal medical training, and both deny having any direct role in providing medical care, other than facilitating administration.

The St. Paul Ramsey Medical Center has an employee assigned to coordinate its contracts with the Department of Corrections. This person is designated as "DOC health care administrator" and works with the warden and the Commissioner of Corrections. The DOC health care administrator from 1974 until 1987 was Howard Johnson, who has a master's degree in hospital administration. He negotiated contracts for physician services between Stillwater and a medical group—Ramsey Clinic Associates. These included contracts for primary physician coverage, inpatient and outpatient services at SPRMC, and referrals of inmates to medical specialists. In addition to arranging for the professional care of inmates, Johnson monitored the administration of health services at Stillwater and was responsible for maintaining and improving the quality of health care there. He has since resigned, and the position is temporarily filled by another employee.

The DOC health care administrator works with all the state's correctional facilities and serves as a liaison with the other state agencies such as the Department of Health. Neither Johnson nor his temporary successor are clinical administrators, however. They do not exercise clinical judgment over the care and treatment of inmates.

None of these administrators claims direct responsibility for the quality of medical care provided at Stillwater. Rather, each views that as the responsibility of the medical director—one of the prison physicians.

*Stillwater Medical Personnel*

Through the first half of the 1970's Dr. Cicero was the Stillwater staff physician. He served full time as medical director and was responsible for the prison infirmary. Dr. Cicero was replaced in 1976 by Dr. McCloed who spent approximately 30 hours per week at the prison infirmary. He was on call other hours, and also cared for hospitalized inmates at the St. Paul Ramsey Medical Center. Dr. McCloed was not associated with any other medical practice and worked full time for the Department of Corrections. He was apparently considered the medical director. After Dr. McCloed left, Dr. James Ewing apparently served as the prison physician for a time.

From August of 1981 through early 1985, the designated Stillwater medical director and sole physician was Dr. James Allan. From the start of Dr. Allan's tenure, he divided his medical services between the prison and a private family practice clinic at Maplewood, Minnesota. He initially spent about half his work time at Stillwater and half carrying a full patient load at the family practice clinic. Generally he would spend mornings at Stillwater and afternoons at the Maplewood clinic. When the new maximum security facility opened at Oak Park Heights, he also became medical director there in 1983. He left correctional health care in April of 1985.

Dr. Allan testified that he considered his role solely as a clinical physician providing sick call and emergency coverage. He disclaimed any responsibility for the overall direction of health care at Stillwater. He contends that he had no responsibility for implementing an infectious disease prevention and control policy at the prison. He denies that he had any role in formally training or evaluating medical personnel. He refused to supervise the laboratory or perform medical administration functions. He denies having had responsibility for developing a disease control policy. He held himself apart from the Stillwater administration, and claims he answered solely to his employer at Ramsey Clinic Associates.

In June of 1985, Dr. Allan was replaced at Stillwater by two physicians, Dr. Fransisco DeLaRosa and Dr. Vijay Eyunni. Both DeLaRosa and Eyunni were contracted by SPRMC for these services. Later Dr. Ramos was also hired to share the duties of primary clinical care. These three physicians currently share physician duties at Stillwater. Only after he began work at the prison, did Dr. DeLaRosa learn he was designated as the medical director. He initially understood that he would provide sick call services only. He testified that he would have requested more money if his duties were to extend beyond sick call

coverage. He did sign documents as the medical director when asked to do so by administrators or by the nursing staff, however. For quite some time, these were the extent of his actions as medical director. He was unaware of the contract between the Department of Corrections and SPRMC which described the function of the medical director.

Dr. DeLaRosa testified that he learned of the tuberculosis problem at Stillwater from a newspaper, and received no orientation on that topic from the staff. He didn't view tuberculosis surveillance and control as his responsibility. Nor did he view tuberculosis disease with much concern because he considers it easy to treat. He continues to work at Stillwater and still does not believe that he has any responsibility for tuberculosis control other than clinical care. He has never seen a tuberculosis protocol for the prison. He does not even seem familiar with the clinical treatment of the disease. For instance, he testified incorrectly about the proper dosage of INH.

In July of 1986, Dr. DeLaRosa passed on the medical directorship to Dr. Eyunni. Eyunni is board certified in emergency medicine. He also has training in public health and institutional medicine. He puts in 12—20 of the 32 hours of weekly physician coverage at the prison. One-half to three-quarters of this time is spent in sick call and the delivery of primary medical services to the inmates. He spends the balance of his time on duties as the medical supervisor. He appears to be a capable physician and administrator, and seems willing to take an active role as medical director unlike Drs. Allan and DeLaRosa. Presently, a physician is generally at the prison five mornings and three afternoons each week. Emergency call coverage is provided 24 hours a day, seven days per week.

Aside from the physicians, there is a medical staff at Stillwater comprised of five or six full-time and four part-time nurses, one or two laboratory technicians,[6] one full-time x-ray technician, two full-time dentists, one full-time pharmacist, one full-time pharmacy technician, and two full-time employees who manage medical records. The Department of Corrections also employs other regular consultants; these include Dr. Donald Dohnalele, a radiologist who is present two afternoons a week, a dietician one and one-half days a week, an ophthalmologist one day every two weeks, an optician six hours every two weeks, and a physical therapist a half day per week.

The nursing staff is supervised by the director of nursing, Evern Olson. Evern Olson has been nursing director since 1976 and has worked with each physician retained since then, as well as administrators Eells, Olson, and Engeldinger. She coordinates sick call as part of her supervisory duties.

Most of the physicians with whom Evern Olson has worked have devoted little time to the supervision of the health services unit. They have taken almost no initiative in imposing continuing education of the medical staff, or implementing standards or procedures for quality control. Evern Olson has frequently taken many of these duties upon herself, but these initiatives have often been overwhelmed by other responsibilities. This has been exacerbated since 1982, as the prison population has increased and administrative control of medical services was transferred to the director of special services who has several other administrative responsibilities. Evern Olson has been overburdened with supervising and training the nursing and other medical staff, as well as coordinating hiring and recordkeeping, maintaining continuity of care, developing or implementing policies and procedure manuals and protocols, and controlling medical specialists' workload. Olson also deals with outsiders such as lawyers, insurance companies, and family members. She tries to keep current on emerging issues such as AIDS and

---

**6.** The lab tech position has proved hard to fill. Because of lack of staff, equipment, and supervising physician, much of the lab work is sent to outside labs; only basic lab work is still done at the prison.

AIDS testing. As a result of Olson's other responsibilities and the physicians' lack of initiative, tuberculosis prevention and control practices by the health services staff have suffered from a lack of attention and continuity.

*Relationship of Department of Corrections and St. Paul Ramsey*

Two contracts between SPRMC and the Department of Corrections deal with physician coverage at Stillwater. Each was for a two-year period, the first effective July 1 of 1983; the second July 1, 1985. After June 30, 1987, Stillwater contracted directly with physicians rather than through SPRMC. Under the 1983 and 1985 contracts, SPRMC provided physicians from Ramsey Clinic Associates. The contracts required that a physician be present at Stillwater five days each week, but they did not designate the number of hours to be served per week. One of the physicians was designated medical director pursuant to the contract. The 1985 contract described the medical director's responsibilities to include the over-all management of the health services unit and the delivery of primary health care to the inmates.

There has been frequent turnover of prison doctors since 1982, and the continuity of medical care has suffered. There has also been confusion between the prison administrators and physicians as to responsibility for institution-wide health issues such as infectious disease prevention and control. In the period from Dr. Allan's arrival until Dr. Eyunni became medical director, no physician took an active role in developing preventive health care policies, establishing a peer review program, or engaging in formal medical staff performance review.

In 1985 the Department of Corrections contracted with SPRMC to provide a physician to serve six hours per week as medical director for the entire state prison system. SPRMC then contracted with the medical director of the prison at St. Cloud, Dr. Harapat, to provide these services. The contract provided for the immediate development of a peer review system. No peer review system has ever been developed,

however. Now the Department of Corrections directly contracts physician's services. The only quality assurance program consists of occasional review of medical charts at quarterly physicians' meetings. These reviews are not well-documented, and there is no record of any findings or results.

*Department of Health Intervention at Stillwater*

Because of the *Hines* decree, the Department of Corrections has maintained since the mid–1970's a series of cooperative agreements with the Department of Health for inspection and consultation at the state correctional facilities. Department of Health inspections now occur annually at Stillwater. In addition, other department personnel have been involved in Stillwater health care delivery, primarily in relation to the tuberculosis outbreak. Allain Hankey, the Director of the State Tuberculosis Control Program from 1977 through September 1985, directed the day-to-day tuberculosis control efforts at Stillwater.

Hankey's education includes a bachelor's degree in community health and master's degrees in both health services and public and environmental health. Her major responsibilities at the Department of Health included keeping a state-wide case register of tuberculosis disease, conducting or coordinating contact investigations, and assisting county health departments in providing chemotherapy and chemoprophylaxis (INH preventive therapy).

As director of the state tuberculosis program, Hankey developed expertise in the general surveillance and control of tuberculosis; she wrote and published a state-wide general tuberculosis control manual in November of 1981. The manual was Hankey's interpretation of the ATS/CDC guidelines for the surveillance and control of tuberculosis. This was distributed to Stillwater and the public health agencies and county tuberculosis control programs around the state.

From 1977 through most of 1982, Hankey had little contact with Stillwater. She was consulted occasionally by health services personnel, and she provided some written material. In 1980 she distributed to

Stillwater a two-page document entitled "Screening for Tuberculosis in Minnesota Correctional Institutions." It explained how to administer and read Mantoux tests and cautioned that prisons were environments with potentially high rates of tuberculosis transmission.

Hankey's more intensive contact with Stillwater began in late 1982. Inmate Antti Haavisto was diagnosed in November 1982 with active infectious tuberculosis. He was treated for the disease, and a limited contact investigation was conducted at Stillwater by Hankey. One year later the inmate in Haavisto's neighboring cell, James Murray, was diagnosed with active tuberculosis disease. A broader contact investigation, supervised by Hankey, revealed widespread infection among inmates in cell hall AEU. Over the succeeding years several hundred inmates throughout the prison have been infected with tuberculosis, and at least eight other inmates have been diagnosed with active disease. Since 1982 Stillwater and the Department of Health have attempted to respond to the epidemic. They have treated infected inmates, tested to determine the spread of infection, and otherwise attempted to control the epidemic. Plaintiffs criticize defendants' response as inadequate and often ineffective. The response by Stillwater and the Department of Health to the tuberculosis epidemic forms the basis of plaintiffs' claims and was the major focus at trial.

Hankey was called into Stillwater in November 1982 after inmate Antti Haavisto was diagnosed as infectious with tuberculosis. His was the first in the series of cases of infections tuberculosis discovered at Stillwater during the period in question. She directed the contact investigation which was conducted in response to Haavisto's diagnosis. From 1982 until her departure from the Department of Health, the Stillwater administrators and health services personnel passed to her virtually total control of the tuberculosis control efforts at the prison. The Stillwater administrators were impressed with Hankey's national contacts, particularly with the CDC. Dr. Allan testified that he deferred to Hankey in all matters regarding tuberculosis except clinical medical care. Milt Olson, Donald Engeldinger and John Twohig, associate warden, all say that they deferred completely to her expertise. They let her take the lead in the contact investigations and relied on her for direction on tuberculosis control practices. Hankey, on the other hand, describes her role as merely providing consultation at the institution's request. She claims that she did not take responsibility for stopping the spread of tuberculosis, but merely offered guidance on issues raised by the institution. She says that tuberculosis prevention is the primary care physician's responsibility.

Hankey asserts that the cooperation she received from Stillwater was always adequate. Yet in her communications with George Rogers of the CDC she complained of inadequate staffing and the administration's inability or refusal to accommodate some of her requests.

Hankey kept her supervisors, particularly Dr. Dean, informed of the tuberculosis situation at Stillwater and documented the results of her investigations. Dr. Dean never took an active role, however. This is due in part to Hankey's consultations with the CDC and Dr. Dean's confidence in its advice. The CDC also reviewed data from contact investigations. CDC personnel never criticized Hankey's methods and assured her that her decisions to end contact investigations were appropriate. The CDC relied entirely on Hankey's representations and data, however. No one from the CDC ever came to the prison to conduct an independent review or evaluation. The health staff relied on the CDC assurances, relayed through Hankey, that the investigations were properly conducted and concluded.

*Tuberculosis Surveillance and Control Practices*

Throughout the 1970's and until the last weeks of 1982, Stillwater's detection and tuberculosis control practices were coordinated by an x-ray technician, Joyce Kiley. She administered and read Mantoux tests which were given to all incoming inmates, and recorded the results as positive or neg-

ative in the inmate's medical chart.[7] Chest x-rays were taken of those inmates with positive Mantoux tests. That was the extent of the tuberculosis surveillance and control. There were no periodic skin tests after the initial test on entry. Nor were any other surveillance measures adopted as were recommended by the ATS/CDC guidelines.

Kiley received no formal training in applying or reading Mantoux results. Allain Hankey testified that Kiley was not always careful or precise with her readings. She had little or no communication regarding Mantoux testing with the prison physician. Dr. Allan, the nominal medical director from 1982 through 1985, was not even aware that Kiley administered the Mantoux tests.

Until 1982 intake Mantoux tests were the only measures taken to monitor or control tuberculosis in the prison. Beginning in 1981 the medical staff began to keep a log of Mantoux test results. Before December 1983 the log did not indicate the size of induration, but only whether the result was positive or negative. This failure to note the size of induration in millimeters was substandard under the ATS/CDC guidelines.

Beginning the last week of 1982 the duties of tuberculosis coordinator were assumed by Sherleene (Sherry) Olson. Except for a nine-month period in 1984 and 1985, she has since supervised the Mantoux testing and recordkeeping. She is now designated as the communicable disease coordinator of Stillwater. Her formal training before 1982 was as a registered laboratory technician, and she was hired at Stillwater for that job. Since then she has received extensive on-the-job training, has worked closely with state Department of Health tuberculosis experts, and has attended national communicable disease workshops.

When Olson began as tuberculosis coordinator, there was no formal protocol adopted by Stillwater for conducting Mantoux testing. She initially learned her job by working alongside Joyce Kiley. On her own initiative she developed a rolodex filing system containing the Mantoux history of each inmate. This was started sometime before March 1984. It now serves as a convenient means of identifying previously tested inmates, previous positives, dates tested, and dates of conversion from negative to positive.

The prison had little literature regarding tuberculosis prevention and control before Haavisto's case was discovered in November 1982. The available information was not frequently reviewed and was not part of any protocol. One document on hand was a state-wide control manual which gave basic information on testing and control. Another document gave a brief description of how to administer Mantoux tests. This information was kept by Joyce Kiley in a desk drawer. There was no attempt by any staff member to compile an internal tuberculosis protocol. Tuberculosis screening was limited to Mantoux testing and x-rays. The radiologist who read the x-rays did not always have inmate charts or clinical histories, including Mantoux test status, when he read the x-ray. The level of suspicion of tuberculosis was low.

Prior to the spring of 1984, most incoming inmates were given a Mantoux test as part of their intake physical unless they had a documented previous positive reaction or stated that they were previously positive and were able accurately to describe the reaction.[8] If there was any doubt about the inmate's claim of a previous positive reaction, he was tested with a half dose of PPD. If that test was negative, he was then tested with a full dose. Inmates transferring into Stillwater from

7. Until the late 1970's all Stillwater staff were required to have regular Mantoux tests. That policy was apparently suspended, however, and not reinitiated until 1986.

8. Persons who react positively to the Mantoux test can experience an extremely large and un-comfortable reaction. Once infected, a person will almost always react to the Mantoux test. Persons who can prove a past positive reaction should therefore not be retested. X-rays serve then as the primary screening device.

another institution were not tested if they were coming from within the Department of Corrections system or had been out of an institutional setting for less than six months. This failure to test all incoming inmates deviated from written standards set by the Department of Health and issued to Stillwater in 1980. All new admittees should have been tested.

In the spring of 1984, the medical staff began testing every incoming inmate who did not have good proof of a previous positive Mantoux, including inter-prison transferees and inmates returning after a short time away. At that time, Sherry Olson began using a separate yellow index card in each inmate's medical file to record Mantoux and chest x-ray history.

On August 1, 1986, Stillwater began using a two-step Mantoux screening process. This involved retesting all non-reactors after ten weeks to assure that the previous negative was not due to latent infection or recent exposure. The two-step process had been recommended by the Department of Health and was based upon ATS/CDC literature in existence for several years previously. The failure to use two-step testing before August 1986 deviated from published standards for tuberculosis control.

Since the initial outbreak in 1982 involving Antti Haavisto, Stillwater has collected an array of tuberculosis literature, including a revised version of the ATS/CDC guidelines. Sherry Olson testified that she inherited some written information from Joyce Kiley. She also requested additional information from the Department of Health which she kept in a red notebook. She updated the notebook regularly with new tuberculosis prevention and control information. Several health services staff testified that the red notebook constituted the only written policies and procedures governing the prison's tuberculosis programs. The contents of the red notebook were not disseminated among health services staff or non-medical prison personnel, however. Sherry Olson and nursing director Evern Olson were the only people with a working knowledge of the tuberculosis control information on hand.

In the fall of 1986 Stillwater received from the Department of Health a tuberculosis surveillance and control protocol specific to prisons. This was part of a statewide health unit policy manual edited by Howard Johnson. The section on tuberculosis screening and control is based upon ATS/CDC guidelines and upon input from the Department of Health. That manual presently governs the methods for tuberculosis surveillance and control at Stillwater, although it is not written specifically for that institution.

While the tuberculosis surveillance and control practices have improved greatly since 1982, the practices have often been inconsistent with recommended standards. Many of the tuberculosis control practices recommended by the Department of Health were not timely implemented. Most improvements have come after this litigation began in April, 1984, and the medical and administrative personnel came under scrutiny.

The way that preventive INH is prescribed has not always complied with recommended practices. Before the spring of 1984, INH was prescribed in monthly allotments of 300 mg per day. This raised concerns that inmates would distribute or destroy the medication, or otherwise abuse it for intoxication or suicide. In 1984 the prescriptions were reduced to a seven day supply of daily doses which the inmates were instructed to self-administer. After 1984 the weekly visit to the medication nurse was used as an opportunity to monitor both for side effects and for compliance. If an inmate did not report to pick up his pills, was observed disposing of the pills, or was otherwise suspected of noncompliance, he was questioned by the nursing staff. If he indicated non-compliance, efforts were made by the nursing staff and physicians to convince the inmate to take the medication. After 1986, if non-compliance was still suspected, directly observed therapy was used.[9] If the inmate continued to refuse to take INH, he was transfer-

---

**9.** Directly observed therapy means that staff watch the patient take his medication.

red to the Oak Park Heights facility until he changed his mind. On return to Stillwater, the inmate would be required to report to health services daily for direct observation while he took his INH.

Coercive practices which were intended to promote INH compliance were largely unsuccessful. When Claudia Miller and Dr. Kristine MacDonald took over from Allain Hankey in 1986, Miller reported to the Attorney General's office that non-compliance was rampant. The Department of Health encouraged Stillwater to adopt a policy of daily directly observed therapy for all inmates taking INH. In 1986, when such therapy was first strongly recommended, there were several hundred inmates receiving INH treatment. Prison administrators would not undertake the logistically complex task of arranging for that number of inmates each day to be watched for compliance.[10] In 1987, Claudia Miller and Dr. MacDonald advised that twice weekly INH therapy was permissible, although MacDonald did not expressly endorse that approach. In July 1987, Stillwater adopted a program of prescribing INH for tuberculosis prevention at the dosage of 900 mg twice per week and observing the inmate take his medication. The program was put into practice beginning in September, 1987, but only for inmates who began their INH therapy after that date.

The prolonged delay in implementing directly observed therapy shows that concerns for administrative convenience and staffing took precedence over recommendations by the prison's medical consultants, to the detriment of inmates. Although defendants apparently seem willing to comply with the Department of Health recommendations now that the low number of inmates taking INH makes the process less burdensome, they presented no evidence of any contingency plans for continuing directly observed therapy for large numbers of inmates should another outbreak occur.

*Antti Haavisto*

Plaintiff Antti Haavisto entered Stillwater as an inmate on March 29, 1982. As part of the regular intake process at the prison, he was given a cursory medical examination by a nurse. The examination included a Mantoux test and chest x-ray. The Mantoux test was positive. The radiologist read the chest x-ray as negative; he noted that it demonstrated no lung abnormalities. This suggested an absence of active tuberculosis. The x-ray was apparently read without the clinical chart present, however, and the radiologist did not know Haavisto's Mantoux status. During his intake exam, Haavisto informed the health services personnel of pulmonary symptoms he experienced while he was incarcerated at the Wadena County Jail from January of 1982. He fell ill while he was at the local jail, and after arriving at Stillwater he speculated that he had tuberculosis. An antibiotic was prescribed by health services, and his comments about tuberculosis were apparently ignored.

He returned to health services repeatedly. On May 16, 1982, he requested a decongestant. On May 17, 1982, he reported an upper respiratory infection; penicillin was prescribed. On May 25, 1982, he again presented himself to health services complaining of an upper respiratory infection; amoxicillin was prescribed. Before June 30, 1982, Haavisto was seen two more times at health services with respiratory complaints; various treatments were prescribed. A blood count and chest x-ray were ordered on June 22. The x-ray was reported by the radiologist as mild pulmonary emphysema. Between June 30 and August 4, the medical chart reflects three more visits to health services. None of the entries on Haavisto's chart indicate respiratory problems; Haavisto testified, however, that his pulmonary problems were persistent. He had several x-rays taken through July 1982. None of his x-ray reports or medical record note the possibility of tuberculosis.

**10.** In 1986 ATS/CDC guidelines suggested that 300 mg of INH be ingested daily for nine months to one year for preventive therapy. Other physicians and prisons were experimenting with twice per week ingestion of 900 mg; this was not a widely accepted method of prescribing INH, however.

His complaints of coughing and chest and back pain were persistent. The health services personnel and guards had instructions from Dr. Allan to give him cough drops when he needed them. Haavisto was sometimes not permitted to report to sick call. On several occasions when he reported, Dr. Allan was absent and the appointment was cancelled. Dr. Allan insists that each of Haavisto's pulmonary symptoms from April through November 1982, was a discrete episode which resolved with treatment.

Haavisto would awaken during the night with severe coughing spells. This would wake other inmates who would make angry remarks and threats. His respiratory problems were so well-known that others worried about being infected by him. Sergeant Marty Lopez was instructed by his supervisor to keep alcohol and rags on the cell block to wipe off the phone after Haavisto used it. In the early mornings and before each meal, it was Haavisto's habit to lie on his stomach for up to an hour to cough up as much sputum as he could so that he could eat in the dining hall without calling attention to his coughing. Haavisto suffered intimidation from fellow inmates who accused him of spreading disease. He testified that he feared for his life. Because of threats he kept to himself for several months prior to the diagnosis of active tuberculosis.

Other inmates in his cell hall (AEU) became irritated and alarmed about his coughing and spitting. They complained to Haavisto, to the guards, and among themselves that he might have tuberculosis. The guards' union confronted the administration about possible tuberculosis among inmates, and several guards were tested by private physicians. In spite of all this, tuberculosis was not considered by the prison health services until October 1982. In sum, the supervisors and medical staff demonstrated inattention and deliberate indifference to Haavisto's welfare and that of inmates and staff with whom he had contact.

Over the summer of 1982 Haavisto requested the opportunity to see a private physician. The request was denied even though he agreed to be financially responsible. This is a violation of the "Patient's Bill of Rights," incorporated in the *Hines* decree, which states that inmates have the right to consult with private physicians. *See Hines v. Anderson*, 439 F.Supp. at 18. At one point in the summer of 1982, Haavisto attempted to obtain a chest x-ray without the approval of Dr. Allan. Dr. Allan intervened and would not permit the x-ray to be taken, accusing Haavisto of wasting state money.

Haavisto reported to sick call on October 14, 1982. He reported that his back and chest pain persisted and that he was coughing up blood. Haavisto was not isolated, nor were further x-rays taken until October 25, 1982. Dr. Allan did order a sputum test, however. It was at this point that tuberculosis was apparently first considered. Haavisto was returned to the cell hall and not isolated. He was required to wear a face mask and discouraged from undertaking any activity which might spread infection from air droplets.

When his October 25 x-ray was read, the Stillwater radiologist noted for the first time an infiltrate in the left lung consistent with tuberculosis disease. He had earlier noted possible pneumonia or emphysema, but never tuberculosis. On October 29, 1982, Haavisto was sent to SPRMC and placed in an isolation unit. His sputum smear was returned on November 1, 1982, and was found to be positive with many acid fast bacilli. He was thereafter considered to be a bacteriologically confirmed active case. He was kept in isolation at SPRMC and started on antibiotic therapy.

The pulmonary medicine department of SPRMC compiled a medical history of Haavisto's symptoms from before his entry into Stillwater. The physicians reviewed a series of x-rays, beginning with his Stillwater entry x-ray from April 1982. The SPRMC radiologist noted that the tuberculosis infiltrate was evident as far back as April 1982. Given Haavisto's clinical symptoms and the manner in which tuberculosis spread at the prison, it is likely that he was suffering from active tuberculosis disease

at the time he entered Stillwater. His medical history taken at SPRMC indicated that at the time of his diagnosis, he was producing approximately one and one-half cups of sputum per day. Haavisto testified that throughout the summer of 1982 he was coughing up "mud" and had been reporting this to the medical service.

On November 1, 1982, after Haavisto's diagnosis of tuberculosis was confirmed, there was a discussion between Allain Hankey, Joyce Kiley, and Evern Olson. They agreed that Hankey would come to the prison that week to survey the situation. When she initially spoke with the Stillwater medical staff, Hankey expressed confidence in the manner in which Haavisto was cared for, but she had very little information on which to base such an opinion. She told Stillwater staff that only those who had been in constant close exposure for a prolonged period were in any danger of infection. This characterization was inaccurate and likely gave the health services personnel a sense of false security. It did not take into account the degree or length of Haavisto's infectiousness or the risk of transmission within Haavisto's cell hall.

Allain Hankey further recommended in her initial conversations that only close contacts—inmates living on either side of his cell—be tested by the concentric circle approach. She also recommended that any concerned staff could be tested. The same offer was not extended to concerned inmates, however. Inmates were not even informed of their possible exposure. It appears that guards in cell hall AEU were offered Mantoux tests in October 1982, even before Haavisto was diagnosed as infectious. It thus seems that tuberculosis was suspected and that administrators acted to allay staff concerns, at the same time Haavisto was unsuccessfully urging the medical staff to consider the diagnosis of tuberculosis.

Hankey came to Stillwater on November 1, 1982 to follow up on Haavisto's diagnosis. Dr. Allan and the nursing staff thought that the entire institution should be screened for tuberculosis. Hankey advised them that the ATS/CDC guidelines recommend a concentric circle contact investigation starting first with highest risk contacts and progressing out to more remote contacts if necessary. Dr. Allan requested a formal written recommendation from the Department of Health regarding the concentric circle method. In response, Hankey drafted a memorandum which was sent to Dr. Allan over the signature of Dr. Andrew Dean, head of disease prevention and control at the Department of Health. The letter described and recommended the concentric circle approach.

The contact investigation began with a survey of Haavisto's daily patterns. Haavisto's first permanent living assignment upon entering Stillwater was to cell hall AEU. He remained assigned to that cell hall until his hospitalization on October 29, 1982. Haavisto was classified as a "permanent idle," which meant that he had no work or education assignment and spent most of the day in the cell hall. As a permanent idle, he was free during certain hours of the day to leave his cell and associate with others. He talked to the guards, watched television in the common area, or visited neighboring inmates' cells.

During the summer of 1982, Haavisto arranged to spend his days in class rather than on a work assignment or on permanent idle. He spent approximately 30 hours per week in the classroom where the prison instructor, Dennis Weir, taught remedial courses to inmates. During Haavisto's tenure as a student from July through October, 1982, there were nineteen other inmates who attended class alongside Haavisto.

In the first few days of her investigation, Hankey briefly inspected Haavisto's cell hall and the classroom to determine where the contact investigation should begin. She did not make any investigation regarding the air ventilation patterns in the cell hall, however. Nor did she study Haavisto's daily patterns in the cell hall. Her inspection focused on the classroom.

The classroom measures 15 × 34 feet. It has windows to the outside and an air conditioner with an outside air exchange. Hankey determined that the classroom

should be the proper focus of the contact investigation because it had a smaller volume of air than the cell hall. She apparently discounted the information received from guards that Haavisto spent most of the time outside of the classroom, in and near his cell. The cell hall was not tested. Kent Grandlienard, a guard, testified that Hankey did not understand the way a cell-block functioned and with whom an inmate was likely to associate.

The class members and the instructor were given a baseline Mantoux which was read on November 9, 1982. Former class members were also located and tested. Hankey observed both the administration of the PPD and the reading of some of the results. The results were entered on a daily log of Mantoux tests and on a contact investigation report form provided by the Department of Health. Four class members were previous positives and were not tested. Three of the inmates showed some reaction. The instructor and eleven inmates had no reaction to the baseline test and were re-tested ten weeks later with the same result.

There was considerable testimony regarding the three inmates whose Mantoux results were positive or questionable. Inmate Billy Slaughter was released before the January retesting so his earlier negative Mantoux was not subjected to the recommended ten week follow-up. It is now clear that he was not infected in 1982, because he was in the prison again in December 1987 when he had a negative reaction.

Inmates Kenneth Prear and John Scruggs presented positive or questionable Mantoux test reactions. Both Prear and Scruggs were given chest x-rays because the Mantoux results arguably were positive. The entry on Prear's contact investigation report form was written: "? 10 × 11 mm ind." The results were also entered on the daily testing log. On that document, the Mantoux test result for Prear indicated: "? Ind (10 × 11 mm)." These results were read and noted by Joyce Kiley; Hankey was apparently not present.

The evidence is not clear as to the meaning of the question mark on these notations. It may mean that the induration was only partial, or that the induration is only slightly over the 10 millimeter threshold suggested by ATS/CDC guidelines as the mark of infection. Prear was scheduled to be released and was instructed to go to the Hennepin County chest clinic for a retest in three weeks. Prear could have been retested at the prison within a few days of November 9, 1982. He was not retested, however, and no follow-up was made by any health services or health department personnel to determine if he was retested or the result.

Scruggs' Mantoux test result of November 9, 1982, was positive. His result was noted as 12 by 15 millimeters of induration. The tuberculosis contact report for the classroom investigation indicates that he was to be evaluated for INH preventive therapy. Scruggs was not considered by Hankey to have been infected by Haavisto, however, because he was reported to have been in the class with Haavisto for only the first six weeks of Haavisto's attendance. Hankey's assumption was based upon what in retrospect appears to be incorrect information. She assumed, for instance, that Haavisto was not infectious when he began attending the classroom sessions. The possibility that he was cannot be ruled out, and should not have been by Hankey. It is precisely because this sort of information is hard to confirm that the ATS/CDC guidelines require further testing whenever any converters are found in a test group. The guidelines presume that the infection was transmitted by the source case. The contact investigation should not have ended before the pool was exhausted or no new converters found.

Despite evidence of the spread of tuberculosis in the first circle of the contact investigation (one confirmed converter and two possibles out of a field of nineteen), Hankey and the health services ended the investigation and tested no further. They did not apparently consider it significant that both Scruggs and Prear lived on cell hall AEU, as did Haavisto; no cell hall testing was done. Hankey testified that

she did not judge either test result to be evidence of infection from Haavisto. In fact, she has only a vague recollection of reviewing the results.

Hankey asserts that at that early point, her involvement was limited and the decisions regarding testing were made by Stillwater personnel. In contrast, most of the prison medical and administrative personnel testified that from the beginning they deferred almost exclusively to Hankey, based on her expertise and actions. The nursing supervisor, Evern Olson, relied completely on Hankey to direct the testing. Dr. Allan testified that he did not see the 1982 contact investigation results, and it was not his decision to end testing. This failure of coordination between the Department of Health and Stillwater medical personnel has been a persistent pattern from the start of the tuberculosis crisis. The decision not to test further is one of the earliest and clearest examples of how blame has been shifted between Stillwater and the Department of Health, to the detriment of prisoners.

By failing to expand the circle after finding positive or questionable converters, Stillwater and the Department of Health violated the ATS/CDC contact investigation procedures which they rely on so strictly in other regards. Because the contact investigation was ended after the first circle, non-tested inmates, particularly those who lived close to Haavisto's cell, were denied access to information from which they could evaluate their risks. Guards were also at risk; testimony showed that Haavisto had a good relationship with the guards and spent considerable time with them. Marty Lopez, the sergeant in AEU in 1982, had spent time with Haavisto in the cell hall. He tested positive in October of 1982. This conversion was not considered evidence of infection from Haavisto. Hankey acknowledges in retrospect, however, that he likely was infected by Haavisto.

Several inmates demanded that they be tested, but were not given that opportunity. The record shows that both inmates and staff suffered stress and uncertainty about exposure. In the weeks after Haavisto's diagnosis, there was considerable concern and agitation by inmates and staff who felt that the administration was not testing as widely as it should and was indifferent to their medical concerns. At the same time as the classroom testing, Mantoux testing was offered to guards and other employees who were anxious about possible exposure. Dr. Allan's recommendation to test the entire institution was not followed, ostensibly because Hankey urged that the only medically acceptable way to proceed was through a contact investigation and concentric circle approach. The fact that line staff members who had minimal exposure were tested, but the inmates in the cell hall were not, shows a lack of concern for the inmates' medical needs and wellbeing. It also discredits defendants' claim that they were proceeding strictly under the ATS/CDC concentric circle approach.

Warden Erickson and Commissioner Pung were informed of Haavisto's active case. They were sensitive to Haavisto's right to confidentiality regarding his illness. They also understood the possible danger to Haavisto from other inmates should his infectiousness be widely acknowledged. The decision not to advise the inmates of their exposure or to offer them medical evaluation was not caused only by the need to keep Haavisto's medical treatment confidential, however. It was also designed to maintain discipline and avoid further agitation. This course of action was detrimental to inmate rights and medical needs.

Haavisto was returned to Stillwater from SPRMC on November 10, 1982. The discharge summaries from SPRMC did not indicate that he should be isolated on his return to Stillwater. Two weeks of isolation is usually recommended, however, as opposed to Haavisto's nine or ten days in the hospital. The sputum samples which would later confirm his non-infectiousness were not yet returned. At the prison Haavisto was continued on the chemotherapy regimen prescribed by SPRMC. He was released from Stillwater on May 8, 1983 and underwent several months of fol-

low-up care and treatment. He still has recurrent pulmonary symptoms which he attributes to permanent lung damage caused by tuberculosis.

*James Murray*

From May 21—October 29, 1982, Haavisto lived in cell 548 of Cell Hall AEU, immediately next to James Murray in cell 549. Murray's was the next active case of tuberculosis discovered at the prison.

Murray had a history of psychotic disorders requiring antipsychotic drug therapy. A few weeks prior to his diagnosis with tuberculosis, he began to complain to the prison psychiatrist of pains in his chest. He was only told that his antipsychotic medication would not cause chest pains. He described a feeling of weakness along with the chest pains. He was not referred for medical evaluation, however, until he suffered a collapsed lung.

On October 22, 1983, about one year after Haavisto's diagnosis, Murray was found ill in his cell. He was sent to SPRMC for medical evaluation. There he was diagnosed as having a collapsed left lung. On October 27, 1983, after being examined by a pulmonologist, possible tuberculosis infection was noted, and sputum tests were ordered. On November 1, 1983, a few acid fast bacilli were detected on Murray's sputum smear. This constituted a bacteriologically confirmed case of infectious tuberculosis disease. A sputum culture reinforced this diagnosis. A second sputum smear taken on November 2, 1983 revealed "rare acid fast bacilli present." This indicates that he was probably not highly infectious.

While at SPRMC Murray was started on a drug regimen. On November 16, 1983, he returned to Stillwater. The hospital discharge summaries did not suggest any need for isolating Murray on his return. At the prison, Murray continued on the treatment regimen prescribed by SPRMC; he was directly observed as he took his medication.

On November 2, 1983, Stillwater informed the Department of Health of Murray's suspected tuberculosis. Over the next several months, Allain Hankey super-vised the contact investigation of the Murray case. The investigation was ostensibly performed using the principles of concentric circle testing recommended by the ATS/CDC guidelines.

Murray was a permanent idle and had lived on the bottom tier of cell hall AEU. He did not leave the cell hall for any work or education assignment. He was described to Hankey as a loner who did not associate with many other inmates on the cell hall. His cell hall contacts were deemed by Hankey to be the highest risk contacts, and the cell hall is where she began the contact investigation. The initial circle of testing for Murray consisted of those inmates who had lived within five cells of Murray from the end of July 1983, until his hospitalization at the end of October 1983, the period which Hankey estimated he was infectious. Other inmates on permanent idle status who lived in the cell hall during that time were also tested in the first circle, as were the inmates who lived on the bottom floor of the cell hall. Inmate locator indexes were used to determine which inmates lived in the designated cells during the relevant time period.

Testing was started on the first circle on November 8 and 21, 1983. The inmates who needed testing were located and tested regardless of their current living unit in the prison. The PPD was administered by Sherry Olson. Hankey was present when the PPD was administered, and she assisted Olson in reading the results. Some of the first circle contacts were not tested until January 10, 1984, the date of 10-week follow-up testing for those inmates who had negative reactions in November. Testing through January 10, 1984 produced fourteen inmates who had converted from a previous negative Mantoux to positive. One inmate presented a questionable test result. In addition, one guard, Kent Grandlienard, tested positive. These Mantoux test results showed a much greater extent of infection than expected. The testing was expanded to a wider circle. By expanding the circle after converters were found, Stillwater was proceeding in accord-

ance with ATS/CDC standards for conducting contact investigations.

The second circle of contacts was the remainder of the inmates who had lived on the same half of cell hall AEU as Murray from July 27 to October 26, 1983. The second circle was tested on January 17, 1984, and read two days later. Inmates with new positive reactions were found in this group also.

The third circle tested was comprised of inmates who had lived on the other half of cell hall AEU during the time which Hankey speculated Murray might have been infectious. Testing of the third circle occurred primarily on January 24, 1984, with reading two days later. Inmates in this circle who missed the January 24 testing were tested on January 31, 1984.

All inmates whose Mantoux tests indicated infection were given a chest x-ray. The radiologist was aware that the x-rays had been taken as part of a tuberculosis contact investigation. If the chest x-ray was negative for tuberculosis, the inmate was screened for eligibility for INH, and where appropriate, it was prescribed. Dr. Allan met with many of these inmates. If the chest x-ray indicated possible active disease, the inmate was sent to SPRMC for isolation, further diagnostic tests, and treatment if necessary. Several inmates were sent to SPRMC for evaluation.

At no time during the Murray contact investigation did any Department of Health or Stillwater personnel acknowledge that the new infections might have resulted from Haavisto. Guards tested in the Murray investigation were questioned about their contact with Haavisto, as well as Murray, however. The forms created to document the test results also referred to the inmates' contacts with Haavisto. Nevertheless, Hankey and Stillwater appeared to be proceeding under the premise that Murray was the only source case. This may have been in part because of the difficulties inherent in tracing all of Haavisto's contacts more than one year after his diagnosis. It was also an effort to save face and avoid liability for previous errors. This same refusal to acknowledge even the possibility that Haavisto was the source of the newly revealed infections persisted through trial.

During the Murray contact investigation, interviews with Hankey were taped for the inmate television channel. In the interviews Hankey attempted to dispel rumors and myths about tuberculosis and the drugs used to treat infection and disease. Hankey was concerned about protecting confidentiality for Haavisto and Murray. Even within these constraints, however, she was not sufficiently candid about the recent history of tuberculosis at the prison and the risks faced by inmates. For instance she would not link the then-present case (Murray's) with the previous year's known active case (Haavisto's). She would not even acknowledge the prior case. Stillwater points to these videotapes as evidence of ongoing efforts at inmate education. But they originated in response to persistent rumors and misinformation among inmates, not as part of a deliberate planned inmate education program regarding infectious disease. Given the circumstances, they were an insufficient effort at inmate education. The lack of an aggressive education campaign in light of the inmates' concerns constituted neglect of their basic health needs.

### Barney Cogshell

Barney Cogshell was tested in the third circle of the Murray investigation. His Mantoux test was read as positive on January 24, 1984. He had previously tested negative in June 1983, well after Haavisto's diagnosis and treatment, so it is unlikely that he was infected by Haavisto. Because of the positive Mantoux result, Cogshell received an x-ray which showed an abnormality. He was referred to SPRMC for isolation and a sputum evaluation. Bacteriological testing at SPRMC confirmed that Cogshell had active pulmonary tuberculosis. He began a regimen of chemotherapy which continued after his return to Stillwater on February 2, 1984. The hospital discharge notes did not indicate any need for isolating Cogshell upon his return to the prison.

Hankey was notified of Cogshell's preliminary diagnosis of active tuberculosis on January 26, 1984. She then began evaluating his contacts for investigation. She did not recall the details of the Cogshell contact investigation at trial. It appears from the inmate locators that many inmates who had lived on cell hall A during Cogshell's time were included in the contact investigation. Those inmates were first tested on February 1, 1984. One hundred and eighteen cell hall contacts of Cogshell were tested as the first circle. In addition, inmates who shared a temporary work assignment with him were tested on February 8, along with any non-exposed inmates who wanted to be tested. This was apparently the inmates' first chance to undergo voluntary testing. Ten week follow-up testing was done on April 16.

The Stillwater records are inadequate to determine if all inmates in cell hall A were tested as part of the Cogshell investigation. Witness recollections were vague on that issue. During the same period as the Cogshell investigation, another case of active tuberculosis was discovered.

*Marty Hughes*

Marty Hughes was identified as a converter in the Murray contact investigation in January or early February 1984. He lived in the minimum security unit. His Mantoux test result was positive, but his chest x-ray was normal. On February 14, 1984, a health services staff member noticed that Hughes had enlarged lymph nodes. After being evaluated at sick call, he was sent to SPRMC where a lymph node biopsy was performed. The biopsy and culture revealed active extrapulmonary tuberculosis disease. Hughes was not cooperative with the treatment. For instance, he refused to permit a lung biopsy. He was discharged from SPRMC against medical advice and returned to Stillwater. There he began chemotherapy. Although sputum cultures and bronchial washings revealed some pulmonary tuberculosis, he was not considered infectious by the health services staff. He was directly observed for INH compliance for only one week, and then was given INH in seven day supplies.

After his release he was not given any INH to take with him or informed where he could receive a refill. He stopped taking the medication in November 1985. He now has undiagnosed spots on his chest x-rays.

A contact investigation was conducted, with the first circle consisting of at least some of the inmates in the minimum security unit. Hankey did not recall whether the entire unit was tested. In all, approximately 45 inmates were tested in the Hughes investigation.

In April of 1984, Hankey conducted a final round of ten-week follow-up testing for inmates Cogshell and Hughes. During the November 1983—February 1984 testing, a total of 107 converters were detected. During the April ten-week follow-up, 135 inmates were tested. Twelve new converters were found, six of whom were not thought to have been exposed to Murray, Cogshell, or Hughes. Several convertors were inmates who lived in cell hall B where no known infectious inmates had lived. Despite these unexplained converters and evidence of prison-wide conversions, no further testing was conducted.

The source of Hughes' infection was not discovered. Hughes entered Stillwater well after Haavisto's diagnosis and treatment, so Haavisto was not likely the source. It is possible that a still unknown source was responsible for the large number of converters found by mid-1984.

The decision not to test the entire institution at this stage is evidence of misjudgment or unthinking rote compliance with conventional testing procedures. Hankey insists that the testing proceeded along strict ATS/CDC guidelines, using the concentric circle approach. She apparently felt that the CDC supported this method. Nonetheless, the ATS/CDC model was being ignored insofar as voluntary tests were being offered to all inmates and staff. Hankey testified that her practice was to undertake the least amount of testing called for in order to avoid disruptions and hysteria. By 1984 there was no point in limiting testing to avoid rumor or disrup-

tion, however; the entire institution was already agitated and concerned.

Between November 1983 and April 1984, approximately 637 inmates were tested, either voluntarily, or as part of several contact investigations. Another 103 previously positive inmates were evaluated for tuberculosis. A good portion of the entire population was thus screened at that time. Converters were being discovered who had no contacts with known active cases.

### Martin Kryzwicki

Martin Kryzwicki was tested in the early stages of the Murray investigation and showed no evidence of infection. On the ten week follow-up Mantoux test on January 10, 1984, he tested positive, however. Kryzwicki's chest x-ray on January 13, showed a small infiltrate, so he was sent to SPRMC. Smears and cultures from induced sputum samples were negative for tuberculosis. Kryzwicki refused to allow a bronchoscopy for further diagnosis. He was prescribed tuberculosis chemotherapy due to the x-ray findings. Subsequent x-rays showed resolution of the infiltrates. On this basis Kryzwicki was classified as a case of active tuberculosis. Because all his bacteriological tests were negative and he denied any pulmonary symptoms, he was never considered infectious and no separate contact investigation was conducted.

### Pedro Fernandez–Martin

Pedro Fernandez–Martin was identified as a converter in the January 1984 follow-up for the Murray investigation. His chest x-ray was read as negative and he was prescribed INH preventive therapy. He refused to take the medication, however, and was therefore scheduled to undergo a semi-annual chest x-ray to screen for tuberculosis disease. The first screening x-ray was taken on July 20, 1984. It revealed an infiltrate on the lung. The radiologist ordered a clinical follow-up to rule out tuberculosis. Fernandez–Martin was sent to SPRMC where sputum specimens were obtained. The sputum smear was negative, but the culture was positive. Chemotherapy was prescribed and Fernandez–Martin was returned to Stillwater on July 31, 1984. The discharge summaries did not recommend isolation. At the time of his return, he had been taking the medication less than seven days. The generally accepted medical practice is to presume that a patient with bacteriologically confirmed tuberculosis is infectious for seven to fourteen days after beginning treatment. Fernandez–Martin returned to SPRMC, and was discharged on August 6, 1984.

At the time of his diagnosis with tuberculosis, Fernandez–Martin lived in cell hall B–East. Hankey has no recollection of carrying out a contact investigation in response to his active case. The Mantoux test records and contact investigation data sheets suggest that several inmates on B–East were tested in July and August 1984. Two converters were apparently found—inmates Vann and Stell. No further testing was done, however, and the concentric circle was not expanded.

By apparently abandoning the concentric circle approach, the Department of Health and Stillwater departed from their previous strict reliance on those standards. By July 1984, it was obvious that tuberculosis was widespread at the prison. At this point it was unreasonable for Stillwater not to have developed a tuberculosis policy and protocol for dealing with recurring cases and for eliminating the disease from the institution. The administrators continued to pass off their responsibility to the Department of Health, and relied almost solely on Hankey to provide any initiatives for dealing with the crisis. Hankey continued to assign primary responsibility to the prison physicians. The physicians denied any role in managing the tuberculosis crisis other than providing primary care. This passing off of responsibility evidenced a lack of care or reckless disregard for the medical needs of inmates.

### Dennis Jarvis

Dennis Jarvis was identified as a converter in the January 1984 follow-up to the Murray investigation. His x-ray revealed no active disease. He testified that he was not told the result of the x-ray. This violated subdivision 2 of the "Patient's Bill of Rights," Minn.Stat. § 144.651 (1973 Supp.),

incorporated into the *Hines* decree.[11] *See Hines v. Anderson,* 439 F.Supp. at 16–17. He was prescribed INH. At first he complied by taking daily INH, but he later refused when rumors circulated that INH could cause sterility and impotence. He claims he was not advised by health services of the possibility of liver toxicity from INH. He refused to undergo a blood-screening liver function test because he thought it was related to his diabetes for which he did not want treatment. Jarvis was counseled by health services about the risks of tuberculosis and the importance of INH. He claims he lost confidence in their advice, however, when they suggested he could not pass tuberculosis on to his girlfriend by kissing while he was on furlough.

Jarvis was discharged from Stillwater in July 1984. He began taking INH about one month before discharge. After leaving Stillwater he spent 21 days in pre-release at the-Lino Lakes facility where he did not receive any INH. He used what he had left and then stopped taking it. He testified that he was not informed where to refill his prescription. He lived with his girlfriend and two small children until his return to Stillwater in September 1985 for a parole violation. Tuberculosis was suspected on his entry x-ray while he was isolated in the receiving and orientation unit. He was sent to SPRMC; there tuberculosis was bacteriologically confirmed. He was treated and released back to Stillwater on October 8, 1985. The discharge summaries ordered that he be isolated, so he was sent to the medical unit at Oak Park Heights. He was directly observed as he took his daily medication and was required to wear a mask while outside of his cell. He returned to Stillwater on December 17, 1985. A contact investigation was conducted, consisting of all employees and inmates who spent time in the receiving and orientation unit from September 20–23, 1985.

In April 1984, Hankey had requested that the CDC conduct a phage type analysis[12] of sputum specimens for four confirmed tuberculosis cases—Haavisto, Murray, Cogshell, and Hughes. They all had identical phage types, indicating their infection likely arose from a common source.

Hankey later sent a sputum sample from Jarvis and Fernandez–Martin to the CDC for phage type analysis. The results suggest that these two inmates were infected by a different source than Murray and Haavisto. The source case has never been identified, but the phage typing results indicate that at least one inmate with undiagnosed tuberculosis is in the institution or has passed through it.

By the spring of 1984, the need for directly observed therapy should have been apparent. Although that practice was not required by any formal guideline, the incidence of non-compliance was great enough that the Attorney General's office was consulted to review methods to compel compliance. A decision was reached that inmates found to be non-compliant would be sent to Oak Park Heights, a more restricted environment. Most inmates disliked transfer there, and that threatened sanction often resulted in feigned compliance.

Warden Erickson testified that directly observed therapy, would have been an administrative burden, but could have been instituted. He testified that he did not consider the benefits of directly observed therapy to be worth the burden on staff and the security concerns which would result.

11. The Patient's Bill of Rights codified in § 144.651 was amended after the *Hines* decree. Subdivision 2 of the statute as it was adopted by *Hines v. Anderson* is as follows:

Every patient can reasonably expect to obtain from his physician or the resident physician of the facility complete and current information concerning his diagnosis, treatment and prognosis in terms and language the patient can reasonably be expected to understand....

12. Phage typing is a method of examining bacilli to determine their type. Phage typing is useful for determining whether a single source caused several cases of active disease. If the phage type of two specimens are different, the patients contracted the disease from different sources. If phage types are identical, it is possible or likely that there was a single source.

*Ervin Graham*

Ervin Graham was transferred from Oak Park Heights to Stillwater in June 1985. As part of his intake physical he was given a Mantoux test and a chest x-ray. His Mantoux test was negative, and his x-ray was normal. On March 12, 1986, he reported to Dr. DeLaRosa at sick call, complaining of flu-like symptoms including fatigue and cough for the prior week. He was prescribed some medications; tuberculosis was apparently not considered. On April 17, 1986, he returned complaining of continued trouble breathing and asthma. He also complained of recent weight loss, loss of appetite, and stomach pain. Medication was again prescribed with no evaluation for tuberculosis. On April 26, 1986, he arrived at sick call with similar symptoms; his medical chart also notes shoulder pain and insomnia. On April 28, the chart indicates that he complained of pain on the left side of his back. Dr. DeLaRosa ordered an x-ray, prescribed an antibiotic for pneumonia, and referred Graham to a dietician to deal with his weight loss. The radiologist's report noted that tuberculosis could not be ruled out. Dr. DeLaRosa apparently did not review that report, however.

The symptoms noted in Graham's chart beginning in March 1986 are classic symptoms of tuberculosis. Given the history of tuberculosis at the prison, Dr. DeLaRosa's failure to consider that diagnosis from the earliest consultations indicates a deficient level of medical care. Diagnosis of tuberculosis is a matter of the primary care physician's medical judgment. Medical experts for both sides testified that proper screening for tuberculosis in an atmosphere like Stillwater requires that tuberculosis be part of the differential diagnosis of any pulmonary illness or x-ray abnormality. Dr. DeLaRosa demonstrated an inappropriately low level of suspicion of tuberculosis in his repeated failure to diagnose Graham's symptoms as tuberculosis. This might be due in part to the turnover of prison physicians and medical directors. It is also likely the result of the prison physicians' passive role in the contact investigations and other infectious disease control measures. Defendants' expert physician commented bluntly that given the history of tuberculosis at Stillwater by 1984, "It would tickle even the most dense doctor's mind" that tuberculosis should be considered when dealing with pulmonary problems.[13]

Graham reported to sick call on May 9, 1986, complaining of weakness. He saw Dr. Eyunni who ordered another x-ray. That x-ray indicated possible tuberculosis, and Dr. Eyunni sent Graham to SPRMC where sputum tests confirmed that he was highly infectious with tuberculosis disease. He began chemotherapy at the hospital and continued it after he returned to Stillwater. The disease had progressed so far that lung tissue had been dissolved; lung cavities were noted on the discharge summary.

After Graham's case was discovered, Sherry Olson requested that Claudia Miller describe to her how to make a differential diagnosis between pneumonia and tuberculosis. It is significant that Olson, a lab tech, not Dr. DeLaRosa, requested this information. Olson demonstrated more initiative and understanding of tuberculosis than many of the medical staff trained in diagnosis and treatment of disease. Dr. DeLaRosa's treatment of Graham indicates that the level of suspicion and scrutiny for tuberculosis remained inappropriately low.

The Department of Health was notified as soon as Graham's case was confirmed, but one of the health service nurses questioned whether it should be. He apparently wanted to avoid the type of disruption that had occurred previously. The tuberculosis problem had by that time gained some notoriety, and this legal action had been filed.

By May, 1986, Hankey had left the Department of Health and had been replaced

---

13. There has apparently been some recent improvement since Dr. Eyunni took charge, but Stillwater still has not developed a policy to assure the appropriate level of scrutiny by all medical personnel, especially the primary care physician and radiologist. The history of medical treatment at Stillwater reveals that continuity of care is broken by frequent staff changes, and attention to serious medical problems laxes when public attention or litigation ends.

by a new director of the tuberculosis control unit, Claudia Miller, a trained epidemiologist. Miller's supervisor was also new to the department—Dr. Kristine MacDonald, an epidemiologist and physician. Miller sent a memo to the health services unit advising them to conduct a contact investigation. On May 13, 1986 a meeting was held for Stillwater personnel. In attendance were the warden, administrative and health services personnel, Miller, and Dr. MacDonald. At the meeting the Department of Health recommended that all inmates in A–West be tested as Graham's first level of contacts. The memo also suggested testing all staff. All inmates with previously positive Mantoux results were to undergo new x-rays if that had not been done in the last three months. This pending litigation was discussed at the meeting.

Defendants have never made it clear why it was suggested that all staff be tested, but not all inmates. Not all staff members had been in contact with Graham, and therefore all were not appropriate candidates for the first circle test. The more likely reason was to alleviate staff members' concerns about infection after so many recent converters. This deviation from the ATS/CDC concentric circle method in order to accommodate staff concerns discredits defendants' claim that they did not test the entire prison because the ATS/CDC guidelines recommended a more limited approach. The failure to test the entire prison at this point was an infringement of the inmates' right to a level of medical care sufficient to avoid serious risks to their health.

The Graham contact investigation focused on inmates who lived in cell hall A–West from April 1–May 9, 1986. The Department of Health also apparently contacted Graham's family members and visitors and recommended that they receive Mantoux tests. Approximately 120 inmates who had lived in A–West were tested, and seven converters were found. The Department of Health recommended that the circle be expanded. Because Graham had no readily identifiable contact group outside the cell hall, and because his source

of infection remained unknown, the Department of Health recommended screening all inmates in the prison. This decision was prompted in part by persistent inmate agitation and a desire to "clean house" and rid the institution of all source cases.

In the first two weeks of June 1986, the entire prison population was tested, excluding those inmates with previous positive reactions and those who had been tested in the initial round as Graham's cell hall contacts. This was the first prison-wide mandatory testing. Approximately 790 Mantoux tests were administered to staff and inmates from May through June 1986. Thirty-two new positive converters were discovered; four were staff and twenty eight were inmates.

Inmates with previous negative reactions in May and June were to be retested ten weeks later. However a sputum test following Graham's discharge from SPRMC showed that he was still infectious after his return to the general population. As a result, the follow-up testing was postponed until September. The failure to assure that Graham was not infectious before rejoining the general population imposed still another unreasonable medical risk upon the inmates. Approximately 644 inmates were tested in September as part of the follow-up. Thirty-one new positive reactors were discovered. All converters were x-rayed to determine whether they had developed active disease.

The first attempt at a comprehensive plan of tuberculosis control at Stillwater was initiated in June 1986. The state epidemiologist, Michael Osterholm, sent warden Erickson a memorandum summarizing recommended measures to control the recurring outbreaks. The memorandum recommended two-step Mantoux testing for all routine screening and follow-up x-rays at six month intervals for all inmates on INH whose compliance was not monitored. It also recommended that the possibility of twice-weekly INH be explored to permit directly observed therapy to begin. Osterholm recommended that a health services staff person knowledgeable in the area of tuberculosis conduct periodic chart reviews

for inmates with symptoms suggestive of tuberculosis, such as an abnormal chest x-ray. Tuberculosis was to be considered in the differential diagnosis of all pulmonary infections.

Health services line staff testified that they consider this memorandum and a 1986 infectious disease control publication to be the institution's current formal policy. Donald Engeldinger, the administrative director of the unit, testified that Stillwater has never received a policy manual regarding tuberculosis control, however. He still does not know of any formal tuberculosis control policy. This reveals again the serious lack of communication and coordination among those primarily responsible for health care delivery at Stillwater.

*Jose Rodriguez Torrez*

One of the inmates tested in September 1986, Jose Rodriguez Torrez, was sent to SPRMC where he was diagnosed as having presumptive active tuberculosis. Because he had not developed a cough and was not producing sputum, he was not considered infectious. He was placed on anti-tuberculosis drugs and returned to the prison. No contact investigation was conducted.

*John Scanlon*

Inmate John Scanlon was transferred from Oak Park Heights to Stillwater on July 30, 1986. His intake Mantoux test was read on August 4, 1986, and was positive. A chest x-ray was taken on August 8, 1986. The radiologist reported minimal infiltrates and recommended that he be x-rayed again within six weeks. The report states that a diagnosis of tuberculosis could not be excluded. Scanlon reported symptoms of tuberculosis. INH was prescribed as a preventive measure. He initially refused a follow-up x-ray. After the x-ray was taken on September 12, 1986, the radiologist recommended evaluation for tuberculosis, and Scanlon was sent to SPRMC on September 18, 1986. At SPRMC sputum samples were taken. The smear and culture results were negative. Because Scanlon received INH before the sputum tests, there is a possibility that he suffered tuberculosis disease and that the tuberculosis bacilli that would normally be present were diminished by the INH. Active infectious tuberculosis could therefore not be ruled out, and SPRMC physicians advised Stillwater to treat Scanlon as an active case. Based on the x-rays, medication for tuberculosis disease was prescribed. Scanlon returned to Stillwater on September 24, 1986.

Because of Scanlon's case and Ervin Graham's return to the general population while he was possibly still infectious, mass follow-up testing was done in December 1986. Of the 747 inmates and staff tested, two converters were discovered. Their x-rays were normal, and they were started on INH.

Scanlon was the last active case of tuberculosis discovered before trial. During the trial, however, mention was made that a Stillwater inmate named Clark was apparently diagnosed with active tuberculosis in December 1987. He was thought to be non-infectious, and no contact investigation apparently occurred. There was no other testimony presented of any further cases.

*Inspections*

The *Hines* decree required annual inspections of the health services unit. *Hines v. Anderson*, 439 F.Supp. at 20. The annual inspection is the only method used to monitor compliance with the decree. At the time the decree was negotiated and entered, there were no existing inspection standards. The Department of Health provided a consultant to create such standards. The resulting standards combine *Hines* requirements—regarding staffing, provision of medical care, and administration—with state-wide inspection standards of all health care facilities. Since 1982, a comprehensive survey form has been developed and used annually.

The inspection standards address many areas: administrative service, dental service, dietetic service, disaster programs, general emergency service, housekeeping, infection control programs, laboratory, laundry, nursing, patient records, pharmacy, physical plant, physical therapy and radiology. The inspection form identifies those standards which were generated by the *Hines* decree.

Inspections are conducted annually by a team of Department of Health employees in the inspection division. The inspections are announced a few days in advance, ostensibly for security reasons. The team usually consists of a registered nurse and an administrative specialist, both trained in inspection techniques. Inspections take two or three days.

Before each inspection the team reviews the previous year's report and notes any deficiencies found in those reports. Those areas are reexamined for compliance. There is some year-to-year inconsistency in noting deficiencies. David Abnet, who has been part of the Stillwater inspection team most years, testified that inspectors look for substantial compliance with the spirit, not the letter, of each standard. The thoroughness of each inspection varies, and the decision to note a deficiency is a subjective one.

Each year the inspectors conduct an exit interview with a Stillwater administrator to point out deficiencies found. A deficiency report is then sent to the warden and health service administrators. Health services staff members are responsible for correcting deficiencies. Deficiencies are not always corrected immediately if correction would require budget requests or be contrary to prison policies. One area of frequent disagreement concerns the infirmary. Correction officials contend that the Stillwater health services unit should not be inspected as if it were an in-patient infirmary. Nonetheless, some inspectors note recurring deficiencies for the prison's failure to comport with the infirmary standards stated in the inspection forms.

Several deficiencies which may have aided the tuberculosis outbreak have been noted repeatedly. As early as 1980, for example, Stillwater was rated as deficient for failing to create a written infection control program. Several annual *Hines* inspections have noted that there is not an adequate patient and disease index and have cited inadequate charting and record-keep-

ing. The inspection reports from 1980 through 1982 noted the failure to distribute the Patient's Bill of Rights. That deficiency has not been cited since 1983. Health services personnel testified, however, that the eight-point Bill of Rights is outdated and not used and that the new 21–point Bill of Rights is incompatible with prison policy and is not distributed or followed.[14] This practice violates the *Hines* decree. *See Hines v. Anderson*, 439 F.Supp. at 16, 17. It also demonstrates that the absence of a deficiency mark does not necessarily mean that a problem has been remedied; it may have just been overlooked by inspectors.

Another persistent deficiency identified noted by inspectors through 1985 was the physician's refusal to make weekly rounds of the segregation unit. Dr. Allan testified that he found making rounds in the segregation unit inefficient and impractical; he refused to do it. This is consistent with inmates' complaints that Allan frequently did not have enough time to complete all of his duties at sick call or in making rounds.

There is no evidence that the inspection standards were drafted with any sensitivity to the special health, hygiene, and sanitation needs unique to prisons. There was apparently no attempt made to incorporate any standards for prison health care published by persons or groups knowledgeable in correctional health care. For instance, no standards are used to evaluate the staff's actual compliance with any written policies.[15] In retrospect, the tuberculosis epidemic might have been avoided if rigorous inspections had taken place in the early 1980's with an emphasis on the high risks posed by infectious diseases in the prison environment.

Another recurring deficiency was the lack of a full time physician until 1985. The parties to the *Hines* decree did not intend to require that a physician spend a specified number of hours per week at Stillwater. Their intention was to have a physician present to meet the inmates' primary

---

**14.** Minn.Stat. § 144.651 was amended in 1976. The amendment increased the number of rights from eight to twenty-one.

**15.** The only exception is that the absence of a disease index and an infectious disease control policy has been noted.

care needs, to direct medical care in the health services unit, and to be on call for emergencies. Splitting this duty among more than one person would have been appropriate if there had been continuity and someone had been responsible for directing the unit. Although the *Hines* decree did not require a physician to be at the prison forty hours per week, it was unreasonable and a violation of *Hines* to permit Dr. Allan to divide his time between Stillwater and a private practice. The problem was further aggravated when Allan took on physician responsibilities at Oak Park Heights. These multiple responsibilities caused him to spend less time than he should have attending his clinical duties as well as participating in staff training, inmate education, and development of disease prevention and control policies.

Several inmates testified that frequently no physician attended to inmates arriving at sick call. Intake physicals for new inmates were generally given by nurses rather than a physician. Without a physician dedicating full attention to Stillwater, opportunities for consultation with a physician were limited. Haavisto testified that Dr. Allan refused to see him on several visits to sick call and refused to order chest x-rays which may have revealed his tuberculosis disease at an earlier stage. The absence of a full-time physician from 1982 to 1985, and absence of a physician concerned with more than sick call consultations, likely contributed to the tuberculosis crisis. Had Dr. Allan or the Stillwater administrators been more aggressive in considering institution-wide health risks, the outbreak may have been less severe or altogether avoided. Better communication and information about medical matters might also have lessened the anger and confusion among staff and inmates regarding the risks they faced from the tuberculosis outbreak.

The inspection reports several times pointed out the lack of a full-time physician and medical director. Despite this recurrent deficiency, the longstanding disagreement between the physicians and the administration as to who actually was responsible for directing the medical services has not been resolved. Each of the administrative heads of health services—Eells, Olson and Engeldinger—describe their role as purely administrative. They portray themselves as advocates for the health services unit within the prison bureaucracy. They place most responsibility on the physician and medically-trained staff for staff training, peer review, development of medical protocols and institution-wide preventative health measures. By contrast, each of the physicians since 1982—Allan, DeLaRosa, and even Dr. Eyunni—have denied any ultimate responsibility for these areas. The tension and confusion in roles, although improved since 1986, remains unresolved, to the detriment of the inmates' present and future health.

The *Hines* decree requires that an administrative chief of medical services be assigned to oversee the health care program at Stillwater. *Hines v. Anderson,* 439 F.Supp at 18. The person with this role should be freed to the extent possible from all other responsibilities to focus solely on efficient delivery of health care. Defendants present two contradictory theories of compliance with this mandate.

Defendants claim first that this requirement was fulfilled by retaining Howard Johnson. Johnson was not involved in the day-to-day administrative matters unique to Stillwater, however, and his position was not equivalent to the full-time medical services administrator required by *Hines* or envisioned by the drafters. In fact, Johnson testified that he participated in negotiating the consent decree; there was apparently no understanding that his position was the one required by the decree. Moreover, Johnson is no longer with the Department of Corrections, and at the time the trial record closed, he had not been permanently replaced.

Defendants' alternative explanation is that the administrative position required by *Hines* was filled by Clyde Eells until 1982, then by Milt Olson until his retirement in 1986, and then by Donald Engeldinger. Each spent at most half of his time with health services matters. Defendants have thus failed to comply with this term of the

*Hines* decree. The failure to assign an administrator of health services who has no other responsibilities reveals either a serious shortage of resources or a failure to make health services a priority. In either case the result is detrimental to the inmates' medical needs.

One of the fundamental concerns of the *Hines* plaintiffs was that:

No inmate shall be deprived of necessary and adequate medical care, including examination, diagnosis and treatment by reason of his status as an inmate, by reason of his indigency, or because he is close in time to release, discharge or parole.

*Hines v. Anderson,* 439 F.Supp. at 17. The evidence revealed several breaches of this condition; the most egregious involved Antti Haavisto, as described previously. Another area where inmates' medical treatment was substandard was in the manner in which INH was introduced. INH is a powerful drug which must be taken for up to one year; it can cause liver toxicity. Inmates were entitled to thorough counseling so they could give an informed consent to treatment. This was not always done. The need for wide-spread acceptance of INH was obvious, yet inmates had misguided beliefs about the drug in many respects. This led to inmate rumors that INH caused impotence or other exaggerated side effects, and ultimately reduced the level of informed consent and compliance. When INH therapy was commenced on a large scale, Sherry Olson was called upon to explain INH therapy to inmates. She created the consent form, and is the prison's primary consultant regarding INH. She has no training or license to do such medical counseling. Inmates are entitled to consult with a physician or nurse who will explain the reasons for treatment and the medical risks, especially liver toxicity and other common side effects. Relegating this role to Sherry Olson constitutes a continuing deficient level of medical care and a violation of the *Hines* decree.

Inmates exposed to tuberculosis were not always timely informed of their exposure. Health services and Department of Health personnel faced a difficult challenge balancing the right of privacy of the infectious person, with the legitimate right of exposed inmates to know they were at risk. This tension demonstrates the difficulties which attach to an outbreak of a communicable disease in prison, and the great need for preventive measures.

*Staff and Inmate Training*

All new Stillwater uniformed personnel undergo pre-service training. Since mid–1985 the orientation has included a brief lecture from a health services nurse regarding the method of transmission of tuberculosis, signs and symptoms, methods of treatment, and the difference between infection and active disease. The health services unit offers no ongoing training on infectious disease control, however, and there is no training policy. Non-uniformed employees see a videotape on tuberculosis as part of their orientation training; but there is no policy for continued periodic training in tuberculosis prevention and control.

An abbreviated presentation on tuberculosis is given to most new inmates as part of the receiving and orientation program. Further education occurs only when an inmate requires tuberculosis-related medical treatment. If an inmate's Mantoux test is positive, he is told about INH therapy and follow-up x-rays. Inmates prescribed INH are told of side effects and the need for preventive therapy as part of the informed consent practices regarding prescription drugs. Other informational programs and materials have been utilized only sporadically. These have generally been in response to inmate demands or to control rumors. There still is no established policy for regular, widespread, and effective education of inmates regarding the diagnosis, treatment, and control of tuberculosis or other infectious diseases.[16]

---

**16.** An undercurrent at trial reflected concern for the future course and treatment of AIDS at Stillwater. It is to be hoped that the scrutiny given to the health services department by this litigation, and the resulting improvements, will help prevent the spread of AIDS infection among inmates.

*Plaintiffs' Due Process Claims*

Plaintiffs allege that defendants' violations of the *Hines* consent decree have infringed their due process rights protected by the fourteenth amendment. They seek injunctive relief under § 1983 for the alleged due process violations. This claim was added to the initial complaint by leave of the court, *see Memorandum Opinion and Order,* June 12, 1985, and has not previously been addressed on its merits in any prior order.[17]

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

Plaintiffs do not claim any substantive due process violation. Rather, they claim that the *Hines* decree created liberty interests which were infringed without affording the inmates procedural due process. *See Williams v. Lane,* 646 F.Supp. 1379, (N.D.Ill.1986), *affirmed* 851 F.2d 867 (7th Cir.1988) (due process violated when no hearing or other process was afforded inmates in protective custody before they were deprived of educational and employment programs). Plaintiffs also contend that violation of *Hines* is the equivalent to a violation of a statute, and is directly enforceable under § 1983. *Cf, Anderson v. Redman,* 429 F.Supp 1105, 1119 (D.Del. 1977) (mandatory language in administrative rule for treatment of inmates had same effect as a statute). These two theories will be discussed in turn.

### A. Procedural Due Process

The interests protected by the due process clause of the fourteenth amendment "arise from two sources—the Due Process clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Plaintiffs claim that the *Hines* decree created certain liberty interests which may not be infringed without affording inmates some process. They cite *Wolff v. McDonnell,* 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974) (inmates have liberty interest in not having good time credits denied without some procedural guarantees), and *Hughes v. Rowe,* 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980) (inmates have liberty interest in avoiding administrative segregation except where necessary for prison security.)

■ Before plaintiffs may prevail on a claim for procedural due process, however, the statute or rule on which they rely must use "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that [the deprivation of that interest] will not occur absent specified substantive predicates." *Hewitt v. Helms,* 459 U.S. at 471–72, 103 S.Ct. at 871. Some of the *Hines* decree requirements arguably contain language of a mandatory character. Plaintiffs point to the language that "to the fullest extent possible ... the 'Patient's Bill of Rights' *shall* apply to inmates ...," 439 F.Supp. at 16; "[n]o inmate *shall* be deprived of necessary and adequate medical care ... by reason of his status as an inmate ...," *id.* at 17; "[t]here *shall* be ... [an] adequate medical staff, including a full time physician ...," *id.* at 18. (emphasis added). Even if this language created constitutionally protected interests, however, the interests would have to be amenable to some sort of process before they could be the source of a procedural due process claim. *See Parker v. Corrothers,* 750 F.2d 653, 657 (8th Cir. 1984) (no procedural due process right is created when parole statute does not contain "particularized substantive standards which significantly guide the [Parole] Board's discretion to grant parole.")

---

**17.** On the eve of trial defendants moved to dismiss the due process claims based on *Hines.* This motion was dismissed as untimely. *Order* October 28, 1987.

The provisions of the *Hines* decree are different from those parole guidelines or inmate segregation rules which have served as a basis of procedural due process claims. *See, e.g., Wolff,* 418 U.S. at 556–57, 94 S.Ct. at 2974–75; *Hughes,* 449 U.S. at 11, 101 S.Ct. at 177. *Hines* does not create any procedural standards which guide the defendants' conduct with regard to any particular inmate. Plaintiffs assert that they are entitled to some notice and hearing before they are denied medication or medical care. They also suggest that defendants should give inmates notice that they are not being informed of the Patient's Bill of Rights. This presumes that the alleged violations of the decree are discrete incidents and that the violations are intentional decisions by defendants. The evidence shows, however, that most of the violations of *Hines* have been through omission or neglect, rather than intentional conduct.[18]

This is not to say that the promises in *Hines* are merely aspirational or that defendants may ignore them at will. Plaintiffs have available remedies for breaches of the decree in a contract action or a motion for contempt. *See Green v. McKaskle,* 788 F.2d 1116 (5th Cir.1986) (court orders do not establish rights actionable under § 1983; rather devices such as contempt are available). The violations may also serve as evidence of neglect of inmates' serious medical needs. *Hines v. Anderson* did not create any procedural due process interests actionable under § 1983, however.

### B. Direct Action Under § 1983

■ Plaintiffs see the *Hines* decree as equivalent to a state statute in providing a direct cause of action under § 1983. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (plain language of § 1983 provides remedy for violation of constitution and statutory law). Plaintiffs point to numerous alleged viola-

tions, and claim that the totality of defendants' conduct constitutes a violation of plaintiffs' civil rights.

Plaintiffs cite no case where a consent decree is deemed the equivalent of a statute for purposes of § 1983 relief. In *Williams v. Lane,* 646 F.Supp. at 1409, which best supports plaintiffs' claim, the court relied jointly on an administrative regulation and a consent decree. The court did not discuss whether the consent decree alone created an interest actionable under § 1983.

Plaintiffs' theory that violation of a consent decree is directly actionable under § 1983 was discussed at length and rejected in *Green v. McKaskle,* 788 F.2d 1116 (5th Cir.1986). "[R]emedial court orders ..., apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create 'rights, privileges, or immunities secured by the Constitution and laws.' " *Id.* at 1123, *quoting* § 1983.

There are prudential reasons not to extend § 1983 remedies to violations other than of constitutional and statutory law. Laws derived after public deliberation and the scrutiny of the political process represent the consensus of the public. In some statutes Congress may choose to preclude the remedy of a suit under § 1983. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). By contrast, consent decrees are often arrived at through private negotiations, and are intended to serve individual interests. Nothing in the language of § 1983 or its legislative history suggests that such agreements were intended to or should provide the basis for a federal civil rights action. *See Maine v. Thiboutot,* 448 U.S. at 7–8, 100 S.Ct. at 2505–06. The *Hines* decree is a case in point. Testimony at trial revealed that the *Hines* consent

---

**18.** One exception concerns the Patient's Bill of Rights. The decision not to adopt the amended 21 point Patient's Bill of Rights was an intentional policy decision based on security and administrative concerns. This action does not

rise to the level of a constitutional violation, however, since there are no "particularized substantive standards" *Parker v. Corrothers,* 750 F.2d at 657, which guide Stillwater's exercise of discretion in this regard.

decree was negotiated by the parties with only minimal involvement of the court. The decree addresses in great detail the manner in which medical care will be provided to Stillwater inmates. The commitments made by the state in *Hines* extend beyond the minimal requirements for medical care of inmates imposed by the Constitution or statutes. The detailed promises, if kept, are beneficial to the inmates and presumably improve the quality of prison life. Yet, if the decree can be the source of collateral civil rights litigation whenever a violation is alleged, there will be a severe disincentive for state authorities to enter future consent decrees.

Many of the alleged *Hines* violations are disputed. Examples include the amount of physician coverage required, the adequacy of medical examinations and records, and the significance of deficiencies noted on the annual inspection reports. Some of these alleged violations turn on the defendants' good faith and substantial compliance with the decree. The consent decree would be unworkable if inmates could bring a federal civil rights action for any perceived violation. It is better for these issues to be resolved through negotiations between the inmate representatives and the prison or through an action to enforce the decree.

After thorough consideration, the court adopts the reasoning of *Green v. McKaskle* and concludes that the *Hines* consent decree may not serve as the basis for a substantive challenge under § 1983.

*Eighth Amendment*

Plaintiffs also seek injunctive relief under 42 U.S.C. § 1983 for violations of the eighth amendment.[19] They argue that the totality of defendants' conduct in response to the tuberculosis outbreak at Stillwater constitutes cruel and unusual punishment. The parties agree that plaintiffs have the burden of proving any constitutional violation. *Clark v. Mann*, 562 F.2d 1104, 1117 (8th Cir.1977). Because only injunctive relief is sought at this time, the court's focus

must be on whether there is a "real threat of future violation[s] or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). Past conduct is relevant to the extent that it shows a likelihood of future constitutional violations, but an injunction should issue only if "there is some indication that [defendants] intend to continue the unconstitutional practice alleged in the complaint." *Tara Enterprises, Inc. v. Humble*, 622 F.2d 400, 401–02 (8th Cir.1980).

■ In order for the inmates to sustain a claim under the eighth amendment for inadequate medical care, they must prove that defendants have exhibited "deliberate indifference to the serious medical needs of prisoners...." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). *Estelle* elaborates on the "broad and idealistic concepts of dignity, civilized standards, humanity and decency ..." against which penal measures must be evaluated. *Id.* at 102, 97 S.Ct. at 290, *quoting Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir.1968). The denial of medical care to inmates is unconstitutional if it results in "pain and suffering which ... would serve [no] penological purpose." *Id.* 429 U.S. at 103, 97 S.Ct. at 290. Inflicting such unnecessary suffering through inadequate medical care "is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the [view that] ... the public [is] required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." *Id.* at 103–04, 97 S.Ct. at 290–91 (footnotes omitted).

■ Under the eighth amendment deliberate indifference by state officials to serious medical needs of prisoners resulting in "unnecessary and wanton infliction of pain" is prohibited. *Id.* at 104, 97 S.Ct. at 291, *quoting Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**19.** The eighth amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It is applied against states through incorporation into the fourteenth amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

Evidence of deliberate indifference can be drawn from the conduct of medical personnel, guards, or others responsible for inmate access to medical care and treatment. *Id.* at 104–05, 97 S.Ct. at 291.

Defendants contend that the deliberate indifference standard requires proof of intentional denial of medical care. The Supreme Court has emphasized that more than an isolated instance of medical malpractice or negligence is necessary to make an eighth amendment claim. *See id.* at 106, 96 S.Ct. at 292 (negligent care does not become a constitutional violation merely because the victim is a prisoner); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986) (eighth amendment claim requires showing of deliberate indifference which is more than an instance of negligence or lack of due care). The eighth amendment should not be made into a "font of tort law to be superimposed upon whatever systems may already be administered by the states." *Id.* 106 S.Ct. at 666.

The Supreme Court has never held that a showing of intentional deprivation of medical care is necessary to prove an eighth amendment violation, however. In some instances deliberate indifference may be shown through reckless conduct. *See, e.g., Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984) (evidence of reckless disregard of inmates' right to be free from sexual assault sufficient to preclude directed verdict on eighth amendment claim); *Glick v. Henderson,* 855 F.2d 536, 539–40 (8th Cir. 1988) (colorable eighth amendment claim is made if inmate shows pervasive risk of danger of contracting AIDS, and officials fail reasonably to respond to the risk). A continued pattern of negligent conduct can also result in unnecessary and wanton infliction of pain:

> [While] a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures....

> [A] series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.

*Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977). *See also Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981):

> [D]eliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff, or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.

*Id.* at 575 (citations omitted).

Here plaintiffs attempt to prove their eighth amendment claim through an alleged pattern of intentional, reckless, and negligent denial of basic medical needs, and noncompliance with published standards of medical care and tuberculosis control. Plaintiffs assert that there is a long and continuing pattern of inadequate staffing, particularly for the positions of primary care physician, medical director, administrative chief of medical services, laboratory technician and records' technician. They claim that Stillwater continues to suffer from inadequate policies and protocols for the surveillance and control of tuberculosis, and fails adequately to implement the existing policies. They allege that the physical facilities are substandard, particularly the health services unit and the cell hall ventilation system. Finally, they allege that there have been repeated instances of medical malpractice and negligence in failing to diagnoses tuberculosis, failing to test adequately, failing to inform inmates of risks, and failing to provide access to needed medical care. They contend that the totality of defendants' conduct amounts to continuing deliberate indifference to serious medical needs of inmates.

Defendants respond that plaintiffs have failed to meet their burden of establishing deliberate indifference. They contend that the evidence reveals a conscientious effort

by Stillwater and the Department of Health to deal with the tuberculosis problem as it evolved. They argue that their efforts were properly based on established standards for responding to an outbreak of tuberculosis. They assert that plaintiffs have failed to show the elements of medical malpractice under Minnesota law and that in any event there were no instances of medical negligence or systemic deficiencies. They acknowledge minor deficiencies, such as failure to live up to letter of the *Hines* decree, but contend that these omissions are not of constitutional magnitude and have been rectified.

A major focus at trial was the various published medical standards which have guided the Stillwater medical staff at various times. Among these are the ATS/CDC Tuberculosis Surveillance and Control Guidelines. Stillwater has had a copy of each current edition of these guidelines for the entire period relevant to this litigation. Stillwater staff also relied on the various tuberculosis control manuals compiled and distributed by the Department of Health, and later the Department of Corrections.[20] A third set of standards which governed medical care at Stillwater are the commitments made in the *Hines* decree.[21]

Defendants argue that none of these standards may be used by plaintiffs "to establish [any] constitutional minima." *Bell v. Wolfish,* 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). They contend that the published standards should be viewed only as flexible goals. In that way courts do not second guess prison officials in matters of prison administration and security. *See id.* at 544, 99 S.Ct. at 1877.

■ Published standards of medical care or adopted guidelines such as the tuberculosis manuals or the *Hines* decree do not establish absolute standards for measuring the constitutionality of official actions. But neither may they be ignored by state officials, however. Such standards and guidelines are useful measures for "determining whether contemporary standards of decency have been met." *Ramos v. Lamm,* 639 F.2d 559, 567 n. 10 (published standards are useful to measure adequacy of prison medical care). The quality of medical care afforded to prisoners may properly be measured by the adequacy of facilities and staffing, as well as through instances of intentional or negligent conduct which impinge on serious medical needs.

Defendants stress that when viewed individually, plaintiffs' specific claims of inadequate or improper medical care were not breaches of any constitutionally imposed level of care. They claim that Stillwater's failure immediately to begin directly observed INH therapy after it was recommended by the Department of Health was not unreasonable in the circumstances. Similarly, they claim that the decision not to begin prison-wide testing until 1986 was reasonable. They acknowledge their failure until 1984 to note Mantoux test results in millimeters or to retest returning inmates who had been out of Stillwater less than six month, but claim that these alleged violations of the ATS/CDC guidelines are minor and do not amount to deliberate indifference. Likewise, they characterize as trivial their failure to remedy some deficiencies noted on annual inspections or otherwise to comply with the letter of the *Hines* decree. When all of defendants' omissions and instances of negligence are viewed in the whole, however, the breaches of established norms are more than trivial.

---

**20.** There was much dispute at trial about which manuals Stillwater medical staff had on hand and relied on at various times. Defendants acknowledge having and relying on the two page Tuberculosis Screening Program drafted by Allain Hankey in 1980. After 1981 they had the State Tuberculosis Prevention and Control Manual provided by the Department of Health, and after 1986 they had the more comprehensive Department of Corrections Health Unit Policy Manual which includes a section on tuberculosis.

**21.** Although the decree did not create constitutionally protected liberty interests in plaintiffs' favor, the *Hines* provisions are detailed commitments by Stillwater for the provision of medical care. Violations of the *Hines* decree are relevant to plaintiffs' claims that persistently deficient medical care contributed to the tuberculosis outbreak.

The evidence at trial revealed many examples of negligent and otherwise substandard conduct by defendants and their agents in response to the tuberculosis outbreak. The situations was at its worst between 1982 and 1986. Perhaps the most obvious example of wanton neglect of an inmates' basic medical needs is the medical treatment provided to inmates Haavisto and Graham. The histories of their medical treatment have been recounted at length. In each case the diagnosis of tuberculosis appears not to have been made until well after that illness should have been diagnosed by a physician exercising reasonable care and the degree of skill normally possessed by physicians in a similar practice. Defendants' expert testified directly to this in inmate Graham's case.[22] Haavisto testified credibly that he told medical personnel that he thought he had tuberculosis, yet such a diagnosis was not considered until later despite his repeated symptoms. Haavisto's testimony was compelling, and the record shows that he was subjected to unnecessary pain and suffering. Dr. Allan unreasonably restricted his access to x-rays which might have led to an earlier diagnosis. He was denied access to a prison physician when he needed to be seen and also to an outside physician. Haavisto was also subjected to cruel and unusual punishment when he was ostracized and threatened by inmates due to symptoms resulting from his undiagnosed tuberculosis.

Dr. Allan's conduct was also deficient in other respects. His refusal to make rounds in the segregation unit was a clear violation of *Hines v. Anderson*, 439 F.Supp. at 19. He was not a full-time physician at Stillwater; he spent at least half of his workday elsewhere. *See id.* at 18. The abbreviated time he spent at sick call likely contributed to the tuberculosis outbreak since his consultations with inmates were necessarily hurried. He also failed to take an active role in medical policies beyond providing primary care to inmates.[23]

Dr. Allan's disclaimer of any responsibility for policy making reveals another serious flaw in the way health care is delivered at Stillwater. No one claims ultimate responsibility for the many supervisory functions within the health services unit. The passing of blame and responsibility between the Department of Health, the administrative director of health services, and the staff physicians has been discussed at length earlier. Each person describes his or her role narrowly, and disclaims ultimate responsibility for directing the effort at controlling tuberculosis. Plaintiffs have shown through the great weight of the evidence that this failure of coordination persists and is a reason why Stillwater's response to the tuberculosis epidemic lagged.[24] Another continuing deficiency is

---

**22.** Defendants claim that the court should not consider allegations of medical negligence because plaintiffs have not presented elements of a prima facie case of medical malpractice under Minnesota law. There was extensive testimony by medical experts from each side regarding the proper standards for diagnosis and treatment of tuberculosis patients. The court need not determine whether all the elements of medical malpractice under Minnesota law have been met before concluding that the physicians' actions were careless or reckless for purposes of the eighth amendment. *See French v. Owens,* 777 F.2d 1250, 1254 (7th Cir.1985), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986) (neglect or misdiagnosis of illnesses including tuberculosis can show violation of eighth amendment).

**23.** Dr. Allan hotly disputes the contention by Allain Hankey and the Stillwater administration that he was responsible for institutional health

care beyond sick call. He disclaims any responsibility for staff training, supervising of the lab, peer review among medical staff, records review, and infectious disease prevention and control policies. He does acknowledge that he was the nominal medical director, however. As such, many of those duties were his. Dr. Steven Miles, M.D. an expert in medical ethics, testified that any physician who practices institutional medicine has dual responsibilities, both to the patient and to the overall system of health care offered at the institution.

**24.** The situation has apparently been relieved somewhat since Dr. Eyunni became medical director in 1986. He has accepted a broader role in administration and policy making than did his predecessors. The problem of passing off ultimate responsibility persists, however, and deserves careful attention from the Warden.

Stillwater's failure under *Hines* to assign "a single administrative chief of medical services who shall oversee and be responsible for the overall health care program at the Minnesota State Prison ... [and who shall,] to the extent possible, ... have no other duties imposed on him...." *Hines v. Anderson*, 439 F.Supp. at 18. None of the men responsible for health care administration has spent more than about one-half of his time at these duties. None has taken any responsibility for developing an infectious disease prevention and control policy at Stillwater, or accepted overall responsibility for the quality of health care delivered. That continuing deficiency contributed to the outbreak and spread of tuberculosis.

Early in the tuberculosis outbreak, beginning in 1982, there were serious failings by the Department of Health. When Alain Hankey first responded to Stillwater's request for assistance, she overstated defendants' ability to control the outbreak and understated the extent of the epidemic and the measures needed to control it. Hankey's decision to end the Haavisto contact investigation after testing only the classroom occupants violated ATS/CDC guidelines.[25] Further testing was required by the ATS/CDC guidelines because there was at least one positive Mantoux converter (Scruggs) within the first circle, and two others could not be ruled out. Hankey should not have presumed that Haavisto was not infectious during his first six weeks in the classroom or discounted Scruggs' conversion.

█ *Defendants also exhibited wanton disregard for inmates' medical needs in 1982–83 when they offered voluntary Mantoux testing to staff, but failed to offer the same to inmates. Similarly, it was unreasonable for defendants not to inform exposed inmates of the risk to their health.*

One example of this is when the warden and Hankey refused during the Murray investigation to acknowledge that there had been a previous confirmed case within the cell hall. Inmates have a right to be informed of known risks to their health resulting from their status as inmates. *See Kelsey v. Ewing*, 652 F.2d 4, 6 (8th Cir.1981). The same pattern of disparate treatment of inmates and staff was evident as late as May 1986, when Dr. Macdonald recommended testing all staff, but not all inmates.

Other instances of substandard care have been discussed earlier. The failure until 1984 to retest inmates who had been out of Stillwater less than six months, and the failure to use two-step Mantoux testing, violated ATS/CDC guidelines. Inmates have been released from SPRMC back into the general prison population before confirmed to be noninfectious. This occurred early on with Haavisto, and then was repeated with Fernandez–Martin, and as late as mid–1986 with Graham. The tuberculosis control policies which Stillwater purportedly relies on are not widely disseminated. Donald Engeldinger testified that he did not know of the 1986 Health Unit publication which the medical staff characterizes as the current policy manual.

There is a continuing dispute about who is responsible for initiating and carrying out tuberculosis control measures at Stillwater. The Department of Health, under Dr. MacDonald, has placed more responsibility on the Stillwater medical staff to conduct screening and direct contact investigations. There is no evidence that Dr. Eyunni or others have accepted that role, however.

Stillwater was ineffective in promoting inmate compliance with INH therapy before directly observed therapy was intro-

**25.** Plaintiffs contend that Hankey erred by choosing the classroom as the focus of the first circle for the contact investigation. The decision where to begin a contact investigation is a matter of judgment by someone trained in epidemiology and knowledgeable regarding the spread of tuberculosis. Although living quarters are usually the best place to find an infect-

ed person's closest contacts, the court should not second guess Hankey's choice to begin with the classroom. In hindsight it now seems clear that whenever a Stillwater inmate is diagnosed with tuberculosis, all of his cell hall contacts should be tested early in the contact investigation.

duced. No published standard required directly observed therapy, yet it was recommended by the Department of Health more than one year before it was finally adopted in September 1987. Warden Erickson considered daily directly observed therapy to be too burdensome in light of security and staffing concerns. If this decision were viewed in isolation, it might seem reasonable and justified. When viewed in the context of the crisis which was then occurring at Stillwater, the decision reveals a less than desirable concern for the health and welfare of inmates.

From 1982 through at least 1986, Stillwater physicians demonstrated an inappropriately low level of suspicion of tuberculosis. There still is apparently no protocol for considering tuberculosis in the differential diagnosis of pulmonary symptoms. Defendants' expert suggested that this should have been in place at least by 1984. The physicians and nurses have also neglected their role in counseling inmates regarding INH. Sherry Olson is the inmates' primary consultant regarding INH, although she has no training or license for that practice.

■ Not only is the eighth amendment standard a rigorous one for plaintiffs to meet, there can be no injunctive relief unless there is a real threat of continued or future conscious disregard to inmates' serious medical needs. *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). Injunctive relief should not be granted without the threat of future inhumane conditions of confinement and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

■ The medical problems at Stillwater are unlike those where a state abrogated its duties to provide even minimally accept-able care. *See, e.g., French v. Owens*, 777 F.2d 1250; *Ramos v. Lamm*, 639 F.2d 559; *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex. 1980), *aff'd in part, rev'd in part*, 679 F.2d 1115 (5th Cir), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977), *aff'd* 616 F.2d 598 (1st Cir.1980). Stillwater did not turn its back on the tuberculosis problem. Some of the control mechanisms at Stillwater clearly worked well. For instance, the x-ray screening program revealed the disease of both Jarvis and Fernandez–Martin before they reported symptoms. The contact investigations following the diagnosis of Murray and Graham were widely conducted and revealed hundreds of converters. This allowed most converters to begin INH therapy before active disease developed. Stillwater has made a determined effort since 1986 to remedy the prior deficiencies which allowed the tuberculosis outbreak to occur.

If the court were called upon to remedy conditions as they existed up until mid–1986, injunctive relief would be appropriate. Up to that point there were serious and persistent instances of negligent and substandard efforts to remedy the tuberculosis epidemic. Defendants seem to have made great progress since 1986, however. No new outbreaks have been reported for over one year. Extensive screening and control practices sought by plaintiffs in this litigation have now been put into place. There are published policies and protocols which address many aspects of a comprehensive tuberculosis surveillance and control program for a prison such as Stillwater.[26] Physician coverage appears now to comply with *Hines*. Plaintiffs have not proven any current shortage of medical staff other than an overburdened head of

---

**26.** Plaintiffs' medical experts, Drs. Stead and King, noted that the 1986 Health Unit Policy Manual is adequate if the policies are actually carried out. Dr. Stead suggested additions to the manual, such as a sputum testing policy, a protocol for choosing the first circle for contact investigations, the compilation of prevalence statistics, AIDS testing for Mantoux converters, and installation of ultraviolet lights in the ventilation plenums. These recommendations are based on his own views of how to control tuberculosis in prisons, and for the most part are not recommended by any published standards. They merit consideration by those in authority, however.

nursing. Plaintiffs criticize Stillwater for assigning Sherry Olson as the infectious disease control coordinator because she has little formal medical training. Her abilities appear to be exceptional, however, and of all Stillwater staff, she has demonstrated perhaps the greatest initiative and persistence in confronting the outbreak. She seems well-suited for that position.

Many of the improvements in tuberculosis detection and control at Stillwater have been sparked by this litigation. This case and *Hines v. Anderson* suggest that inadequate attention has been given to serious medical needs of Stillwater inmates in the absence of litigation and public scrutiny.[27]

After a careful consideration of the entire record, the court finds that plaintiffs are not entitled to the injunctive relief they seek. They have not proven that the prison facilities or the way in which medical care and tuberculosis control is currently conducted is so deficient as to be "inconsistent with contemporary standards of decency...." *Estelle,* 429 U.S. at 103–04, 97 S.Ct. at 290–91. Nor have plaintiffs proven that the problems of the past are likely to recur unless enjoined. The present medical care system, as it relates to the control and treatment of tuberculosis at Stillwater, is not deficient to the extent that it amounts to deliberate indifference to inmates' serious medical needs. Plaintiffs' claims for injunctive relief pursuant to 42 U.S.C. § 1983 should therefore be denied.[28]

### ORDER FOR JUDGMENT

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiffs' claim for injunctive relief is denied.

2. All other claims in the complaint having been previously withdrawn, dismissed, or otherwise resolved, plaintiffs' action is dismissed.

3. Judgment be entered in favor of defendants, but each side shall bear its own costs.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**27.** The issue whether plaintiffs are entitled to attorneys' fees or costs under § 1988 because of the impact of this litigation is not now before the court.

**28.** Plaintiffs have suggested that a special master be appointed to monitor health care matters at Stillwater, particularly tuberculosis surveillance and control practices. The improvements in tuberculosis control sought by plaintiffs have

been substantially achieved. Appointment of a special master is inappropriate in the absence of present constitutional violations or injunctive relief requiring monitoring. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1159–63 (5th Cir.1982), *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *see generally* 5A Moore's Federal Practice paragraph 53.05[2].